McKinley Rough.txt

THE MATERIAL CONTAINED IN THIS ASCII FILE IS AN

UNCERTIFIED TRANSCRIPT OF THE DEPOSITION OF JEFFREY

G. MCKINLEY, TAKEN ON JULY 10, 2012, AT SARNOFF, A

VERITEXT COMPANY, 450 SANSOME STREET, SUITE 1510,

SAN FRANCISCO, CA, AND IT HAS NOT BEEN REVIEWED OR

PROOFREAD BY THE COURT REPORTER.  ANY REFERENCE TO

PAGE AND LINE NUMBERS WILL NOT BE ACCURATE.

UNDER CCP 2025 (R)(2), THIS TRANSCRIPT MAY NOT

BE USED, CITED, OR TRANSCRIBED AS THE CERTIFIED

TRANSCRIPT, NOR MAY IT BE CITED OR USED IN ANY WAY

OR AT ANY TIME TO REBUT OR CONTRADICT THE CERTIFIED

TRANSCRIPT.

--oOo--


BY MS. CLASBY ENGEL:

    Q.   Good morning, Mr. McKinley, how are you

today?

    A.   Good morning, I'm fine, thank you.

    Q.   Could you please state your full name for

the record, please.

    A.   Jeffrey G McKinley.

    Q.   Thank you.  As you I mentioned, I'm

counsel for the plaintiff and I'll be asking you

some questions today.  You've been deposed a number

of times; correct?


    A.   Yes.

    Q.   Okay.  And for the last 12 years, have you

served as an expert witness.

    A.   Yes.

    Q.   Okay.  And have you ever testified that an

insurance commission was too high?

McKinley Rough.txt

A.   I don't believe I've testified on the
subject of commissions in -- in any of my previous
testimonies.

Q.   Okay.  And have you ever testified that an
insurance rate or premium was too high.

A.   No, I've never testified on the subject of
insurance rates or premiums.

Q.   So you've never been certified as an
expert as to insurance commissions or insurance rate
of premiums.

        MR. WINSTON:  Object to to form.

        THE WITNESS:  I've been certified as an
expert in insurance industry custom and practice and
insurance broker custom and practice, but not on
those particular subjects.

Q.   Okay of the and just to talk about some of
the cases as you served as an expert witnesses.
You've been paid to testify for entities like Bank
of America, correct?

A.   I've -- I was retained by attorneys who
were representing Bank of America in a case, that's
right.

Q.   Correct.  And also companies like U-Haul
International; correct?

        MR. WINSTON:  Object to form.

        THE WITNESS:  I have -- either was a case
where I was retained by attorneys who were working
on behalf of U-Haul International.

BY MS. CLASBY ENGEL:

Q.   Right.  But ultimately it's the -- the
person who you're testifying on behalf of that pays

Page 2

McKinley Rough.txt

your bile, right, the attorneys aren't ultimately

paying your bill, it's the company who you're

representing; correct?

       MR. WINSTON:  Object to form.

       THE WITNESS:  Often I'm paid by the

attorneys.  I assume that they're reimbursed by

their clients.  I don't have direct knowledge of

that fact.

BY MS. CLASBY ENGEL:

    Q.   Okay.  And you were paid hired by

attorneys to testify on behalf of Zurich America

insurance company; correct?

       MR. WINSTON:  Object to form.

       THE WITNESS:  Yes, I was, in one

particular -- in one particular case, uh-huh.

BY MS. CLASBY ENGEL:

    Q.   Okay.  And you've been hired by attorneys

to testify on behalf of United Health Group

Incorporated; correct?

    A.   Yes, I was.

    Q.   And you've been hired by turns to testify

on behalf of Gotham Insurance Company; correct?

       MR. WINSTON:  Object to form.

       THE WITNESS:  Yes, I was.

BY MS. CLASBY ENGEL:

    Q.   And you've been hired by attorneys to

testify on behalf of Hartford Casualty Insurance

Company; correct?

    A.   Yes, I have.

    Q.   Okay.  And have you ever served as an

expert witness on a case involving forced place or

Page 3

McKinley Rough.txt

lender place insurance?

    A.   No, I have not.

    Q.   So you've never been qualified at as an expert on forced place or lender place insurance; correct?

    A.   That's correct.

    Q.   And have you ever acted on -- as a broker

or an agent as to a lender place policy?

    A.   When I was with one of the brokerage firms, the name of Emett & Chandler back in the 1980s, I was the senior executive in charge of an account named First Nationwide Bank.  First Nationwide Bank had a bender placed insurance type of program.  I wasn't the day-to-day person on the account.  I didn't do the placing of the insurance. I was the relationship manager, if you will, on the account and was familiar with the coverage the bank was provided including that particular program, but I wasn't involved in the -- in the placement itself.

    Q.   And how long a period of time was that?

    A.   As best as I can recall, it was two or three years.

    Q.   Okay.  So for two or three years in the 1980s you were on an account that did forced place insurance, but you weren't primarily responsible for it, is that correct?

    A.   Yes, I'd say that's right.

    Q.   Okay.  Any other experience specifically with lender placed or forced place insurance?

    A.   No.

    Q.   Have you ever asked to testify before

McKinley Rough.txt
Congress for the federal government as an expert on

insurance issues?

    A.   Have I ever asked to, is that --

    Q.   No, sorry.  Have you ever been asked by

Congress or the federal government to testify as an

expert on insurance issues?

    A.   No, I have not.

    Q.   Okay.  And have you ever been asked to

testify before any insurance commission or any other

governmental entity as an expert on insurance

issues?

    A.   No.

    Q.   Have you ever worked for an insurance

commissioner?

    A.   No.

    Q.   Have you ever been involved in setting

insurance rates?

        MR. WINSTON:  Object to form.

        THE WITNESS:  When I worked add an

insurance underwriter, part of the function of the

underwriter is to set the rates that apply on

particular policies, and I would do that on many

occasions in that capacity.

BY MS. CLASBY ENGEL:

    Q.   And when was that?

    A.   I was an underwriter from 1973 to 1978.

    Q.   Okay.  But you've never been part of the

governmental entity setting insurance rates;

correct?

    A.   That is correct.

    Q.   Okay.  And you've never published any

McKinley Rough.txt

paper on lender placed insurance?

    A.   I have not.

    Q.   And you've never been asked to speak to
know the topic of lender placed insurance?

    A.   I have not.

    Q.   Okay.  We've sent the court reporter the
exhibits.  And it's our second exhibit that we sent
the court reporter, which is your entitled expert
rebuttal report, if the court reporter --

        MR. WINSTON:  She's asking you to show him
a copy of the second exhibit.  Did you want to mark
the deposition notice as Exhibit 1?

        MS. CLASBY ENGEL:  I mean, sure we can do
this.  Exhibit 1, if you'd like to mark it, please,
the exhibit, which is your notice for deposition
here today, this can be marked as Exhibit 1.

        MR. WINSTON:  And then you want to mark
the expert rebuttal report as Exhibit 2?

        MS. CLASBY ENGEL:  Yes, please.

        MR. WINSTON:  Okay.

                - - -

         (Whereupon the documents were
        marked, for identification purposes, as
        Exhibit 1 and Exhibit 2.)

                - - -

        MS. CLASBY ENGEL:  Going back a moment to
Exhibit 2 --

        THE COURT REPORTER:  Just a moment.  Just
a moment.

        MS. CLASBY ENGEL:  Okay.

BY MS. CLASBY ENGEL:

McKinley Rough.txt

    Q.   Have you ever been involved in setting
rates for lender placed insurance?

         MR. WINSTON:  Object to form.

         THE WITNESS:  No, I have not.

BY MS. CLASBY ENGEL:

    Q.   Okay.  I'd like to call your attention to
what's been marked as Exhibit 2.  And after you've
taken a moment to look over it, can you tell me, is
this your expert report in this matter?

    A.   Yes, it is.

    Q.   Okay.  Thank you.  And are your opinions
in this case contained in this report?

    A.   Yes, they are.

    Q.   And you don't have any other opinions at

this time that are not in the report?

    A.   That's correct.

    Q.   And do you plan to testify as to any other
opinions?

    A.   No.

    Q.   And does your report list all the cases
that you've served as an expert in?

    A.   No.

    Q.   Okay.  And how did you pick the cases to
list in the report and some you didn't list in the
report?

    A.   I've provided a list of cases I've
testified in during the last four years.

    Q.   Okay.  So there were others before that?

    A.   Yes.

    Q.   And was there ever a case in which you
were not qualified by the Court as an expert?

                        Page 7

McKinley Rough.txt

A.   No.

Q.   Okay.  And I see it says that for 23 years
you worked as an insurance broker; correct?

A.   Yes, I believe that's right.

Q.   Okay.  And during those 23 years you were
paid through commissions; correct?

A.   I was always a salaried employee of a
company.

Q.   Okay.  And was your company paid through
commissions?

A.   At times, but not always.

Q.   How else would it be paid besides
commission.

A.   There were several clients who paid us
fees instead of -- in lieu of commissions.

Q.   And what's the difference between a fee
and a commission?

A.   A commission is a percentage of the
premium that is most commonly paid by an insurance
company.  A fee is a -- an amount of money paid by
an insured to the insurance broker.  For services
that they perform.

Q.   So sometimes you were paid by the insurer
for services; correct?

A.   Insured, or insurer, I'm sorry, what does.

Q.   Insured, with a D?

A.   Insured, yes, at times we are paid by the
insured.

Q.   Okay.  And would you say the majority of
the time when you you worked as an insurance broker
for 23 years, you were paid by commissions by the

McKinley Rough.txt

insurance companies?

    A.   Are you asking about our firm, because

I -- as I said before, I wasn't paid fees or
commissions.  I was a salaried employee.  So I --
are you asking to speak on behalf of the firms that
I was employed by?

    Q.   Sure.  Let me rephrase it.  For the
majority of the 23 years you were working as a
broker, were the firms you worked for primarily paid
through insurance commissions?

    A.   Yes.

    Q.   Okay.  And on page 6 and 7 of your report,
it lists the materials that you reviewed in
formulating your opinions.  And are those all the
materials you reviewed to formulate your opinions?

    A.   There were two documents I reviewed
subsequent to writing this report.

    Q.   Okay.

    A.   One was the -- one of the lender placed
insurance master policies.  And the other was the
expert report by Mr. Miller.

    Q.   And did those affect your opinion at all?

    A.   Did not change my opinion.  No, I wouldn't
say it affected it.

    Q.   Okay.  And why didn't you initially review
the LPI master policy?

    A.   I hadn't asked for it until after the

report and I felt it was something I would want -- I
wanted to take a look at and it was made available
to me.

Page 9

McKinley Rough.txt

Q.   And which LPI master policy is that
specifically?

A.   You know, I don't -- I don't know -- I
don't have that information right here.  I believe
it was one of the master policies issued in the
State of Florida, but I don't know which one.

Q.   Between -- between whom?

A.   It was issued by Assurant, but I don't
remember the year or -- or what specific lines of
coverage other than it was lender placed insurance.
I -- I can --

Q.   And --

A.   I can provide that information to you if
you'd like it ate a later time.

Q.   Thank you.  And did you have access to any
material relating to the case.

A.   "The case"?  Which cases are you
referring.

Q.   The country, did the case that we're here
on Kunzelmann versus Wells Fargo?

MR. WINSTON:  Object to form.

THE WITNESS:  Uh-huh.  Did I have access

to it?  Yes, I believe I did.

BY MS. CLASBY ENGEL:

Q.   Okay.  And could have asked for any
material you wanted to see relating to the case;
correct?

A.   I believe I could have, yes.

Q.   And you've read testimony from the
Williams versus Wells Fargo case; correct?

A.   Yes.  One deposition, uh-huh.

Page 10

McKinley Rough.txt

     Q.   Right, but you didn't read the order
granting class certification in that matter; did
you?

     A.   I did not.

     Q.   And you didn't read the order finding
Mr. Berenbaum was qualified as an expert witness in
that matter, did you?

         MR. WINSTON:  Object to form.

         THE WITNESS:  I did not.

BY MS. CLASBY ENGEL:

     Q.   Okay.  And you've read the amended
Complaint in this case; correct?

     A.   I don't believe I have.

     Q.   Listed on page 6?

     A.   I stand corrected, thank you.  Yes, I did
review it.

     Q.   Okay.  So you read the Amended Complaint
in this case; correct?

     A.   Yes.

     Q.   But you didn't read the order denying
Wells Fargo's motion to dismiss; correct?

         MR. WINSTON:  Object to form.

         THE WITNESS:  I did not.

BY MS. CLASBY ENGEL:

     Q.   And you didn't read all the depositions in
this matter -- in the can you understand he will man
matter; did you?

         MR. WINSTON:  Object to form.

         THE WITNESS:  I don't know if -- what
other depositions were.

         There were.  I've listed the depositions I

McKinley Rough.txt

did read.

BY MS. CLASBY ENGEL:

    Q.   Okay.  So you're not sure that you read
every single deposition in the Kunzelmann case;
correct?

    A.   That's right.

    Q.   And you didn't review all the documents
that were produced in this matter either, did you?

    A.   I -- I don't know what other documents
were produced.

    Q.   So you don't know that you've read all of
them; correct?

    A.   I don't know that I've read all of them.

    Q.   Okay.  And did you ask for specific
materials, or did Wells Fargo counsel give materials
to you?

    A.   Wells Fargo's counsel provided me with the
documents that I've identified.  I did ask to review
the insurance policy I mentioned earlier.

    Q.   Okay.  And who have you been retained by
in this case?

    A.   Carl to know fields.

    Q.   On behalf of which clients?

    A.   Wells Fargo insurance and Wells Fargo
Bank.

    Q.   Okay.  And when were you retained?

    A.   Oh, in June of this year.

    Q.   Okay.  And how many hours have you worked
on this matter?

    A.   It would need to be an estimate.  I think
it's an estimate in the 35 to 40-hour range.

McKinley Rough.txt

Q.   Okay.  And how much are you being paid to
work on this matter?

A.   I'm being compensated at 375 an hour for
consultation and document review and 575 an hour for

testimony at deposition and trial.

Q.   And who is paying your fees?

A.   I invoice Carlton Field, that's who paid
my -- has paid my invoices his so far.

Q.   And do you know how much you've been paid
so far or billed?

A.   I issued an initial invoice for retainer
of $5,000, and that was paid.

Q.   Okay.  And so you haven't -- there's been
no other bill since the original   thousand dollars
retainer?

A.   Just a couple days ago I sent an invoice
for the work I had done through the beginning of
July.

Q.   And how much was that bill?

A.   If I'm remembering correctly, it was
approximately $14,000.

Q.   Okay.  And when you were making this
report that's Exhibit 2, was there any analysis that
didn't make it into the report?

MR. WINSTON:  Object to form.

THE WITNESS:  I -- I don't believe so.

BY MS. CLASBY ENGEL:

Q.   Okay.  And was there prior drafts of your
report?

A.   There -- there were, yes.

Q.   Okay.  And how many prior drafts?

Page 13

McKinley Rough.txt

A.   I don't recall.

Q.   And did you draft the entire report?

A.   Yes, I did.

Q.   And did anybody else edit the report?

A.   I had my wife review it for -- as an
editor, and counsel also reviewed it for any
editorial corrections.

Q.   And did counsel have editorial
corrections?

A.   I think there were a few, yes.

Q.   And would prior drafts reflect those
corrections that counsel had?

     MR. WINSTON:  I need to object on the
basis of work product.  I believe under the current
version of the Federal Rules of Civil Procedure,
prior drafts aren't discoverable.

BY MS. CLASBY ENGEL:

Q.   Okay.  Well, I'm asking if they would at
least reflect it, not what the content of those
edits are.

A.   The way I work when I'm drafting a report
is to create a word document and then as I edit, I
edit on the screen.  I don't save and print things.

So, you know, I don't have copies of prior drafts.

Q.   How would counsel have sent you edits,
then?

A.   I e-mailed the then current version of the
report to them and we discussed that on the phone.

Q.   And would counsel make changes to the
report?

A.   No, they did not.

Page 14

McKinley Rough.txt

Q.   On the document itself?

A.   No, they did not.

Q.   Okay.  So he would tell you over the phone
what changes?

MR. WINSTON:  Object to form.

BY MS. CLASBY ENGEL:

Q.   He wanted to have made?

A.   Yeah, they were -- they were corrections,
typos, punctuation, kind of things, yes.

Q.   Okay.

Okay.  On page 7 of your report, it says
that you interviewed David Franski?

A.   Yes.

Q.   And who is David Franski?

A.   David Franski is an employee of Wells
Fargo insurance.

Q.   Okay.  And you how long was this

interview?

A.   It was more than one and it was soon --
best as I recall half an hour.

Q.   Half an hour total?

A.   No, probably half an hour in the initial
conversation and subsequent ones were not direct
interviews with Mr. Franski.  He was in on telephone
calls and various subjects were being discussed and
he was asked to provide information about some of
those subjects.

Q.   Okay.  And you could have asked him any
questions you wanted to; correct?

A.   Yes, I could have.

Q.   And did you ask Mr. Franski about -- I'm

Page 15

McKinley Rough.txt

sorry.  Did you ask Mr. Franski about soft dollars?

A.   No, I didn't.

Q.   Did you ask him about how the relationship between Wells Fargo and Assurant originated?

A.   Yes, I did.

Q.   Okay.  And what did he tell you?

A.   He told me that he wasn't a part of Wells Fargo insurance at the inception of the relationship, but he understood that his predecessors are put together a lender placed insurance program for what was then nor west bank.

Q.   So he has no personal knowledge of how the relationship originated; correct?

A.   By personal you mean correctly involved in that process, apparently he did not.

Q.   Correct?

A.   Yeah, apparently no.

Q.   Okay.  And you said he mentioned his predecessors, what predecessors do you mean, or did you understand he meant, what do you mean by predecessors?

A.   He worked at nor west insurance and my understanding was he was referring to individuals who worked at nor west insurance prior to him.

Q.   Okay.  And what was his explanation of the inception of the -- of the relationship between Wells Fargo and Assurant?

A.   That Norwest Insurance had put together a -- insurance lender placed insurance program for Norwest bank.

Q.   Okay.  And how did Assurant get involved?

Page 16

McKinley Rough.txt

          MR. WINSTON:  Object to form.

          THE WITNESS:  I believe he stated that
there were a number of insurance companies that at
that time wrote lender placed insurance.  Assurant
was one of them and that they were involved in the

process and I believe were ultimate -- that it was
ultimately the carrier that was selected to
underwrite the insurance.

BY MS. CLASBY ENGEL:

    Q.   And what other insurance companies were
interviewed by Norwest Insurance?

    A.   He did mention some names.  I don't
remember them right now.

    Q.   Okay.  And have you looked at any -- do
you have any evidence that verify that is that
actually occurred?

          MR. WINSTON:  Object to form.

          THE WITNESS:  Any written evidence, I do
not.

BY MS. CLASBY ENGEL:

    Q.   Okay.  And did you ask him what Wells
Fargo Bank's role has been in the relationship with
Assurant?

          MR. WINSTON:  Object to form.

          THE WITNESS:  I didn't ask him that
specific question that I recall.

BY MS. CLASBY ENGEL:

    Q.   Okay.  So do you know what Wells Fargo
Bank's role has been in forming its relationship
with Assurant?

McKinley Rough.txt

          MR. WINSTON:  Object to form.

          THE WITNESS:  Sir, you know, based on my

experience, a -- an insured has a relationship with

their insurance company that exists through their

insurance agent or broker.  And insureds have direct

contact with their insurance company at times, but

not always.

     Q.   Okay.  And I'm not asking about your

experience.  I'm asking about what you actually know

in this case that Wells Fargo Bank did to originate

or create the relationship with Assurant?

          MR. WINSTON:  Object to form.

BY MS. CLASBY ENGEL:

     Q.   My understanding is you don't know.

     A.   I didn't understand you were asking me

about the original placement when I answered your

question previously.

          Yeah, I don't know what the original role

of Norwest bank was at the formation of the program

at its inception.

     Q.   Okay.  And do you know what Wells Fargo

Bank's role has been at any time in terms of

negotiating a relationship with Assurant?

          MR. WINSTON:  Object to form.

          THE WITNESS:  I -- I understand that they

have a relationship with Assurant as respects the

tracking program.  And they deal directly with

Assurant on that program and the negotiation of the

terms of that service that's provided, all subject

to the participation of Wells Fargo insurance.

     Q.   So Wells Fargo Bank does deal directly

                    Page 18

McKinley Rough.txt

with Assurant, at least with respect to the tracking
program?

    A.   That's my understanding, yes.

    Q.   And is that tracking program paid by
insurance premiums?

    A.   My understanding is that it is not, that
it's directly -- that it's -- that service that
service is paid for directly by Wells Fargo Bank.

    Q.   And do you know if the payment that Wells
Fargo Bank made -- makes relating to that tracking
program pays for the entire tracking program,?

    A.   I don't think I know one way or the other.

    Q.   Okay.  And you don't know if part of the
insurance premiums are used to pay for that tracking
program either; do you?

    A.   I do not know.

    Q.   Okay.

    Q.   And do you know if it was in fact Wells
Fargo Bank that negotiated the 11 percent commission

for Wells Fargo insurance?

        MR. WINSTON:  Object to form.

        THE WITNESS:  So the insurance commission
that was paid by Assurant to Wells Fargo insurance
is paid pursuant to their rate filings in the
various states in which they do business and its per
the agency agreement that exists between Assurant
and Wells Fargo insurance.  So it's, you know, it's
my understanding that Wells Fargo Bank had no role
in that.

    Q.   But do you know one way or the other if
Wells Fargo Bank did have a role in negotiating the

McKinley Rough.txt

11 percent commission?

    A.   It's my understanding that that wasn't a negotiated commission.  That's a commission that is specified in the rates in the various states in which Assurant does business with Wells Fargo insurance and is specified in the contract that exists between Assurant and Wells Fargo insurance.

    Q.   Right.  But it's not filed with the rates until after it's negotiated; correct?

        MR. WINSTON:  Object to form.

        THE WITNESS:  I -- that isn't my understanding of how the process would work.  The process would work.

    Q.   So your answer?

    A.   The process would work such that the insurance company would file its rates with the various states, each state has a different process for evaluating the rates.  And each -- each state would deal with that issue differently, but it's the state that says, okay, we approve or disapprove the rates.  And in that rate that they're approving is the commission.  So it's not a negotiation between an insured and an insurance company.

    Q.   Okay.

    A.   I'm sorry, can we take one quick break, I needed some water.

    Q.   Okay.  Of course.

    A.   It's right here.  But I need to unbuckle.

    Q.   Take your time?

        THE VIDEOGRAPHER:  Off the record, 9:37 a.m.

                          McKinley Rough.txt
                 (.

                 Discussion off the record.

                 THE VIDEOGRAPHER:  We are back on the
record at 9:38 a.m.
BY MS. CLASBY ENGEL:
       Q.   Okay.  Can you hear me?

                 MR. WINSTON:  Yes action we're good.


                 MS. CLASBY ENGEL:  Okay.  Are we ready to
go back on the record.

                 MR. WINSTON:  Yes, I am.  Back on the
record.  We're good.

                 MS. CLASBY ENGEL:  Okay.  Great.
BY MS. CLASBY ENGEL:
       Q.   When you were speaking to Mr. France ski,
did you ask him about their decision to stop
accepting the 11 percent commission?

       A.   No, I don't believe I discussed that with
him.

       Q.   And do you know how many people at Wells
Fargo insurance work on lender placed insurance?

       A.   No, I don't.  It's -- I don't know the
total number.

       Q.   You didn't ask Mr. Franski how many people
it takes in order to earn this 11 percent
commission?

       A.   You know, my understanding is there are
two individuals at Wells Fargo insurance who are
involved more in the day to day, but there are a
number of support people that also have various
roles in an insurance broker to support any account
team.  I don't know how many it takes at Wells Fargo

                          Page 21

McKinley Rough.txt

insurance to do that.

    Q.   And did you ask him how much Wells Fargo
insurance receives in commissions per year relating
to the Assurant work?

    A.   My understanding is that it's 11 percent.

    Q.   Right, but what that translates in terms
of dollars?

    A.   I didn't ask him that.  I've seen
testimony about the various amounts.

    Q.   Okay.  And in your opinion would
$44 million a year for the service of two people be
excessive or correct?

        MR. WINSTON:  Objection.  Outside the
scope of the witness's opinions and report.  You can
answer.

        THE WITNESS:  You know, it's my opinion
that an 11 percent commission for this kind of
program is less than custom in the industry.  Normal
commission rates would be in the 15 to 20 percent
rain -- range.  It's my opinion that this is less
than the low end of the typical range.
BY MS. CLASBY ENGEL:

    Q.   Okay.  So if that 11 percent translated to
$44 million a year for 2 people to work on this
matter, that would be appropriate, right, as long
as -- as long as it was 11 percent?

        MR. WINSTON:  Object to form.

        THE WITNESS:  You know, the various
commissioners in the various states that have
approved the Assurant rates have approved an
11 percent commission.  They're the ones that have

McKinley Rough.txt

given regulatory agreement with that rate of
commission.  And whether they looked at what -- how
much that translated to in dollars, I have no idea.
BY MS. CLASBY ENGEL:

    Q.  Right.  Okay.  Well, leaving insurance
commission aside for a minute, then I take it your
answer would be yes, that if they received
$44 million a year and there's two people working at
Wells Fargo insurance on this, that that would be
appropriate because that's what the 11 percent turns
out to be; correct?

        MR. WINSTON:  Object to form.

        THE WITNESS:  So insurance commissions are
paid by insurance companies per their filings with
the state or -- and per their contract with the
insurance agents.  And they do so by custom and
practice.  Assure rapt was paying an 11 percent rate
on the lender placed insurance program for Wells
Fargo Bank and yes, regard -- the insurance company
pays that percentage regardless of the dollar amount

that it translates to.  So they're doing what
they're supposed to.  They're acting in compliance
with the regulations.  They're conforming to the
contract that they've signed and they're paying a
commission rate that's less than what would be
standard in the industry.
BY MS. CLASBY ENGEL:

    Q.  Okay.  I appreciate that, but I still
don't think you're answering my question, which my
question isment.  If two people worked at F -- at
Wells Fargo insurance on lender placed insurance and

Page 23

McKinley Rough.txt

that garden neverred them $44 million a year action
you would have no objection to that as long as it
was the 11 percent of the premium; correct?

      MR. WINSTON:  Object to form.

      THE WITNESS:  The -- the concept of paying
commission is irrespective of what work an agent or
broker does for that commission.  And so I'm just
saying that it's custom and practice in the industry
that commission rates are paid irrespective of what
an agent or broker may do to, quote, unquote, earn
that commission.

BY MS. CLASBY ENGEL:

    Q.   So a broker could do nothing and still
earn the commission?

    A.   It -- it -- it's possible that they could.
There is nothing in the -- number an agency
agreement with it says how much commission is to be
paid, that specified what they need to do in
services they provide to the insured.  It does
specify what they need to do in relationship to
their -- to the program as respects the insurance
carrier.  And nor do the regulators specify that
certain services need to be provided in order to
establish whether or not a particular commission is
appropriate in the rate or not.

    Q.   Okay.  And is it your opinion that that
Wells Fargo insurance is entitled to collect a
commission on its placement of Wells Fargo Bank's
lender placed insurance program?

    A.   Yes.

    Q.   And --

McKinley Rough.txt

        A.   If -- if that's what the rates call for,
and that's what their contract says should be paid,
yes, I believe they're entitled to that.

        Q.   Okay.  So it is your opinion that Wells
Fargo insurance is entitled to collect the
11 percent commission on Wells Fargo Bank's lender
placed insurance program with Assurant; correct?

        A.   I believe they are because that's what the

rate regulate -- the regulated rates specify and
what their insurance contract with the insurance
company specifies.

        Q.   Okay.  And that would be your opinion
across the board; right, for all the premiums and
all the policies issued pursuant to that
arrangement; correct?

                MR. WINSTON:  Object to form.

                THE WITNESS:  As opposed to what?  I don't
understand your question maybe.

BY MS. CLASBY ENGEL:

        Q.   Meaning if they're entitled to an
11 percent commission, which is -- I understand is
your opinion, it wouldn't vary by who the homeowner
is, for example it would just be the same 11 percent
commission would be appropriate for the entire
Assurant Wells Fargo Bank portfolio; correct?

                MR. WINSTON:  Object to form.

                THE WITNESS:  Well, it's my understanding
that each of the states that have approved the rates
that Assurant uses specifies an 11 percent
commission.  So in each of the states, yes, and it's
my understanding that there's an agent agreement

                        Page 25

McKinley Rough.txt
between Wells Fargo insurance and Assurant that
specifies an 11 percent commission applicable to all

policies that are written in the program. So yes,
it would apply to all policies written in in the
program.

     Q.   Okay.  And do you know of any instance
where this 11 percent commission would not be
appropriate in the Wells Fargo Assurant
relationship?

          MR. WINSTON:  Object to form.

          THE WITNESS:  No, I -- I can't think of
one as I sit here today.

BY MS. CLASBY ENGEL:

     Q.   Okay.  Okay.  And on page 7 and 8 in
number 1, you state that an agent's principal role
is that of relationship creator and manager.  Is
that your position?

     A.   Yes, it is.

     Q.   Okay.  And if an agent doesn't create the
relationship, do they still deserve a commission?

     A.   Agents receive commissions at inception of
a program and they typically receive commiss at
each renewal.  True of every -- you know, every
commissioned property and liability policy that I'm
familiar with that has commission, it's paid at the
inception of the policy and for each renewal.

     Q.   Okay.  But if a particular agent or broker

was not the agent or broker that created the
relationship as -- at its inception, then would they
be entitled to a commission at any point?

                    Page 26

McKinley Rough.txt

A.   Yes, because they are paid -- premiums are typically paid each year on an annual basis. Sometimes it's monthly but -- or quarterly, but policies generally are renewed each year and a part of those renewal policies, there are certain commission payments.  There's -- it's common in the industry for an insurance policy to exist for a client through their broker.  And then over -- after a period of time, there's a change of brokers.  The client wants to have a new broker and so they terminate their relationship with their existing broker and hire a new one.  The same insurance policy from the same insurance company stays in effect.  But it's the new broker who then gets the commission, year after year after year.

        And so, yes, my answer to your question; yes, they get commissions each year for managing the relationship.

    Q.   Okay.  And if they were not the broker that originated the relationship, would they deserve less of a commission?

    A.   No.  Commonly -- common -- you know, the

common wisdom in the insurance business for brokers is that brokers spend an inordinate amount of time and energy the first year a policy is written, and the commission rate commonly does not compensate them enough for that.

        In the subsequent years, it's not unusual for there to be less work involved on the part of the broker, but the broker still gets the same commission, because it's -- the work is not a

Page 27

McKinley Rough.txt

function of how much commission you get.  You get
commission based on what's in the regulated rate in
all the different states and what the agency
agreement that exists between the agent and the
insurance company specifies will be paid.

    Q.   Okay.  So basically, there's not a
correlation between the work done and the commission
earned?

    A.   There's not a correlation between the work
done on behalf of the insured and the commission
that's paid, because the in -- commission is paid by
the insurance carrier, not by the insured.  And the
insurance carrier is compensating the broker for
what it has determined is important to it, the
insurance company.

    Q.   Okay.  Is there a correlation between the

work that -- the broker does for the insurance
company and his commission?

    A.   There -- there can be at times.  Sometimes
there isn't.  It depends.

    Q.   So there doesn't have to be a correlation
between the work done by the broker for the
insurance company and the commission earned;
correct?

    A.   I suppose that depends on what you mean by
work.  You know, brokers and agents consider it work
to create a relationship with a client that then
trusts them to place their insurance and they go to
an insurance company who then compensates them for
bringing the business to them.  I mean, I -- in my
mind that's work, I've done that, and that's --

Page 28

McKinley Rough.txt

involves a lot of work.  And that's in part what an
insurance company is compensating its agent for.

Q.   But there's no set correlation between the
amount of work performed and the commission earned.
That's what I'm understanding you're saying, about
can I think you said earlier they don't have to do
really any work in order to have the commission
earned as long as it's in the rate, the filed rate,
and the agreement?

A.   Right, I said I -- that's right.  I think

that's generally true.  As I said, there are
exception to say that.  There are some insurance
contracts that exist between insurance companies and
brokers that specify more services that the
insurance broker is supposed to provide that are
sometimes commonly provided by an insurance company.
But that's not the case here.  And that's -- that's
just an exception to the general rule that I stated
earlier.

Q.   So the general rule is what?

A.   The general.

Q.   Aside from the exception?

A.   The general --

Q.   I'm sorry, aside from the exception, the
general rule is what?

A.   Yeah, the general rule is that commissions
are paid per the regulated rates in the 50 states
and per the insurance agreement, agency agreement
that exists between the broker and the insurance
company.  And it's not dependent upon what services
are provided to the insured.

Page 29

McKinley Rough.txt

Q.   To the insurance company; correct?

A.   That's where the exception comes in.
Sometimes -- there are certain things that brokers
do on behalf of insurance companies and the

contract -- the agent agreement specifies that when
that applies.

Q.   Okay.  But leaving that exception aside,
the general rule is then that the amount -- that the
commission is not dependent upon the work performed
as long as it's in the filed rate and in the
agreement; correct?

MR. WINSTON:  Object to form.

THE WITNESS:  Work performed.  I guess I'm
struck Ling with your worse -- words work performed
as I went off on a tangent there about what I
consider work.  I think it is work performed.  They
are compensating the broker for work performed.
BY MS. CLASBY ENGEL:

Q.   Okay.  Well, why don't we do this, can
you -- aside from the exception that you've
mentioned, can you tell me what your general
understanding and general rule is for the commission
that we've been talking about.

MR. WINSTON:  Object to form.

THE WITNESS:  Okay.  And just to
understand, these aren't personal opinions I have.
These are -- I'm describing industry custom and
practice.
BY MS. CLASBY ENGEL:

Q.   Okay.

A.   And the industry custom and practice is
Page 30

McKinley Rough.txt

that commissions are paid really for three reasons.
One is that rates have been approved by the
regulators in various states and if you're writing
an insurance policy in that state, those are
approved rates that include commissions.  And so per
regulation the insurance commissions are paid.

Number two is that if you're an agent for
an insurance company, you have an agent agreement
and most commonly those agency agreements specify a
rate of commission.  That agreement is a contract,
so the insurance companies are contractually
obligated -- I'm not a lawyer, you know, but I've
worked with these agreements in the past, and it's
my understanding that your con -- insurance
companies is contractually obligated to pay those
amounts.

And the third reason is that it's custom
and practice in the industry as respects the
independent agency system that independent agents
receive commissions when they place and renew the
insurance with insurance companies.

Q.   Okay.  Thank you.  And who manages the
relationship between Wells Fargo Bank and Assurant?

A.   Wells Fargo insurance does that.

Q.   And what evidence do you have to support
that conclusion?

A.   The best evidence is that the
relationship, my understanding is the relationship
has been a long and healthy one.  That the Assurant
continues to provide insurance for Wells Fargo Bank,
that Wells Fargo Bank is satisfied with the services

Page 31

McKinley Rough.txt

that Assurant provides, and Assurant is satisfied
with the relationship they have with Wells Fargo
Bank.  So Wells Fargo insurance has been a
successful relationship manager based on the
evidence -- based on the evidence that it has been a
long term relationship.
BY MS. CLASBY ENGEL:
    Q.   Okay.  Do you have any other evidence
other than the fact that it's been a long term
relationship?
        MR. WINSTON:  Object to form.
        THE WITNESS:  Sorry, evidence of what was
the original, evidence you're looking for?
BY MS. CLASBY ENGEL:
    Q.   Other than the fact that it's been a long
term relationship, do you have any other evidence
that Wells Fargo insurance is the party that manages

the relationship between Wells Fargo Bank and
Assurant?
        MR. WINSTON:  Object to form.
        THE WITNESS:  So there's a contract
between Wells Fargo insurance and Wells Fargo Bank
that specifies some of the responsibilities and
duties of Wells Fargo insurance and that's a part of
what is involved in the management of that
relationship.
    Q.   Okay.  Any other evidence?
        MR. WINSTON:  Object to form.
        THE WITNESS:  Well, I think the -- I think
the exhibit that is attached to my report that
Mr. Franski put together speaks to the other things,

Page 32

McKinley Rough.txt

it's a partial list of the other things that Wells
Fargo insurance has done to the benefit of Wells
Fargo Bank.

BY MS. CLASBY ENGEL:

    Q.    Okay.  So basically, the longevity, the
contract and the things that Mr. Franski said,
that's your evidence?

    A.    And -- yes.

    MR. WINSTON:  Object to form.

    THE WITNESS:  I understand this are other
things well, but I've -- Mr. Franski provided a list

that I've reviewed and understand that to be part of
the evidence, uh-huh.

BY MS. CLASBY ENGEL:

    Q.    And did you do anything to verify the
accuracy of Mr. Franski's list?

    A.    I did discuss items with him.  I didn't
independently verify with anyone else somewhere
okay.  An page 8 of your report, you state that
although these services commonly benefit all after
all parties, it's is insurance -- not the insured
that pays the commission.  Is that your testimony)
check quote (.

    A.    Yes, it is.

    Q.    Okay.  And is it your testimony that the
insured in this case bears no responsibility for
paying the commission?

    A.    The insured pays a premium.  I would
assume the insured understands there's a commission
being paid in the premium.  But they don't pay that
commission.  They pay a premium.  It's the insurance

Page 33

McKinley Rough.txt

company that pays the commission.

    Q.   But the commission ultimately comes out of
the premium; correct?

    A.   It's included in the premium, that's
correct.

    Q.   Right.  And the insured is the one that
pays the premium; correct?

    A.   Yes.

    Q.   Is it fair to say that your opinion in
this case that's reflected in your report is based
upon your understanding of the insurance industry's
custom and practice?

    A.   In part it is, yes.  Not entirely, but
yes.  I think that the payment of commission by
insurance companies to agents and brokers is very
consistent with industry custom and practice and has
been for many, many years.

    Q.   Okay.  Anything other than industry custom
and practice.

    A.   I --

       MR. WINSTON:  Object to form.

       THE WITNESS:  Yes, as I've said before,
the commissions are paid consistent with industry
custom and practice, but they're also paid because
of the regulatory reason that if rates that have
been filed and approved in the various states
include commission and therefore the insurance
companies, in order to comply with the filed rates,
need to pay their agents commissions.  And then the
other reason is that the insurance company in this

Page 34

McKinley Rough.txt

case and commonly in the industry has an insurance

agreement -- agency agreement with their agent and

that agency agreement specifies that the agent will

be paid commissions for insurance policies that are

placed with that insurance company.

    Q.   Okay.  And on page 8 you state that by

custom and practice in the insurance industry, it is

also the case that companies pay the agent

commission regardless of whether an agent performs

these services adequately or at all.  Is that your

testimony?

    A.   Yes, it is.

    Q.   And your opinion is based at least in part

on this statement; correct?

        MR. WINSTON:  Object to form.

        THE WITNESS:  My opinion is based on that

statement, I don't understand your question.  This

is -- you know, I'm -- I'm stating what the custom

and practice is, and that's incorporated in my

opinion.  Is that what you're asking?

BY MS. CLASBY ENGEL:

    Q.   Yes, I mean, would your opinion change if

that statement weren't true?

        MR. WINSTON:  Object to form.

        THE WITNESS:  Yes, it would.


BY MS. CLASBY ENGEL:

    Q.   Okay.  And so is it your testimony that is

broker is entitled to a commission even if they

inadequately perform their services?

    A.   You know, I think that by the regulation

as I mentioned and the contract as I specified,

Page 35

McKinley Rough.txt

brokers and agents earn their commissions.  If -- if
they do their job poorly, they still receive the
commissions.  They usually get fired and another
agent or broker is hired to replace them and perform
the service adequately.  But regardless --
regardless of whether they performed it adequately,
they still get paid.

     Q.   Okay.  And they could still get a
commission even if that year they didn't perform any
services?

     A.   Yeah, I mean, that's not unusualment I
have my homeowners insurance with State Farm
insurance and that State Farm agent gets commissions
year after year that I renewed my policy.  I haven't
talked to my agent for years, and -- and, you know,
is that performing a service, in my opinion it is.
There's -- State Farm is still providing insurance
to me.  The agent sends me the policy, well,
actually, it probably comes directly from State

Farm, thinking about it, so my agent isn't doing
anything, but they stand ready to, if I call him on
the phone, I expect him to answer my question and
answer my question.

     Q.   Okay.  And on page 8, you state -- you
state at number two that the American agency system
is the back bone of the insurance industry in the
United States with a few notable exceptions
insurance companies in America do not have their own
sales force.  Can you describe for me what you mean
by the American agency system?

     A.   So there are generally two kinds of

Page 36

McKinley Rough.txt

insurance companies.  There are direct writers such
as Allstate and State Farm.  They have their own
sales force and do not sell insurance through --
commonly don't sell insurance through independent
agents or brokers.  But the vast majority of
insurance companies, the ones that are, you know,
somewhat household names from travelers to Hartford
to Chubb to AIG to Gulf, all kinds of different
carriers, Travelers, I guess I said that.

        They're all -- they all operate under a
system where agents and brokers essentially act as
their sales force.  They -- the agents and brokers
are the ones that bring business to their

underwriters who select which risks to write and
then decide what coverage to provide and what price
to charge.  And that is -- that's the American
agency system and it's been the back bone of the
industry for hundreds of years.

    Q.    Okay.  But it's also not impossible for an
insurance company to have its own sales force;
correct?

    A.    As I said, some -- some companies do.
Like a State Farm or Allstate, Liberty Mutual are
examples of insurance companies that have their own
sales force.

    Q.    Right.  And this American agency system is
it basically just part of the -- the custom of the
industry?

    A.    I think I would call it the custom in the
industry.  I don't -- I'm not familiar with it being
stated as a law anywhere.  It's just the way that --

                    Page 37

McKinley Rough.txt

Q.   Right.

A.   -- the industry has always been conducted.

Q.   Okay.  Also on page 8 at number two, you mentioned that insurance companies pay their agents commissions because those agents bring business to them.  And in this case who acted as the insurance company's agent here?

MR. WINSTON:  Object to form.

THE WITNESS:  When -- you're asking me when the policy was originally put in place, is that the question?  Who was acting as the agent at the time.

BY MS. CLASBY ENGEL:

Q.   Well, with he can start then and come to today?

A.   Okay.

Q.   Who acted as the agent when the Assurant relationship commenced?

A.   It's my understanding that it was Norwest Insurance.

Q.   Okay.  And who acteds as the agent now?

A.   Wells Fargo insurance.

Q.   Okay.  And has Wells Fargo insurance brought Assurant any business other than that related to Wells Fargo Bank?

A.   I do not know.

Q.   Okay.  So you can't name a single other client that Wells Fargo insurance has brought to Assurant other than Wells Fargo Bank?

A.   I don't know of others, they may be -- they may exist, I'm -- I don't know.

Page 38

McKinley Rough.txt

Q.   Okay.  And is wells four go insurance

working for Wells Fargo Bank or for Assurant or for
both?

A.   You know, "work for", the -- an agent
working in the system that we're -- we've been
discussing here today has duties both to the
insurance company and to the insured.  And so they
perform services for both commonly.  They provide
services for both.  But they are paid by the
insurance company.

Q.   Okay.  And who -- who is Assurant's
competition in this business for lender placed
insurance?

A.   Was that -- your question is, is their
competition or was.

Q.   Well, who is, who is their competition in
lender placed insurance matters?

A.   I'm not -- I'm not totally familiar with
the market, I understand that QVE is another carrier
who writes this insurance, this kind of insurance.

Q.   Do you know of anyone else?

A.   I do not.

Q.   Okay.  So if Wells Fargo insurance is
looking for lender placed insurance, there's only
two companies you could go to; correct?

MR. WINSTON:  Object to form.

THE WITNESS:  My under -- my understanding
is those are two insurance companies that write this
kind of insurance.  I'm not aware of others that are
currently doing so.  You know, it's not unlike other
insurance programs that I've dealt with in the past

Page 39

McKinley Rough.txt

that are considered hard to place insurance.

There's often one, sometimes only one insurance

company that writes that particular kind of

insurance that you're seeking on behalf of your

client.'s

BY MS. CLASBY ENGEL:

    Q.   And what is your understanding of Wells

Fargo Bank's role in the placement of lender placed

insurance in this matter?

        MR. WINSTON:  Object to form.

        THE WITNESS:  What -- what's their rolled

as the insured?

BY MS. CLASBY ENGEL:

    Q.   Yes.  Well, actually, can you describe to

me your understanding of how the lender placed

insurance works in this case with the Assurant Wells

Fargo Bank, Wells Fargo insurance relationship?

        MR. WINSTON:  Object to form.

        THE WITNESS:  In terms.

BY MS. CLASBY ENGEL:

    Q.   In terms of how it's placed, when the

premium's paid, those types of matter?

        MR. WINSTON:  Object to form.

        THE WITNESS:  Mm-hmm, mm-hmm.  My

understanding of how it works in this instance is

that a master policy has been -- is put in place on

behalf of Wells Fargo Bank and the policy covers the

properties upon which Wells Fargo has made a loan.

And it's a master policy and certificates of

coverage are issued to borrowers who have allowed

their insurance to be -- to lapse or to be canceled

McKinley Rough.txt

and they have not put alternative insurance in
place.  So the coverage is triggered by a lapse of
coverage or a cancellation or a nonrenewal.  Wells
Fargo Bank then tried to establish and -- and
communicates with the borrower saying we understand
your insurance has lapsed, it's your responsibility
to put new insurance in place.  They make several
efforts at that communication.  If that insurance
does not get put into place, then a certificate is
issued to cover that property back to the date when
the insurance was canceled, renewed or -- or lapsed.
And the borrower is charged the premium for that
insurance coverage back to that date.  The premiums
are collected and paid to the insurance company.

BY MS. CLASBY ENGEL:

    Q.   Okay.  And then the insurance company pays
Wells Fargo insurance the commission; correct?

    A.   That's right.

    Q.   I mean -- okay.  And then anything else,
do you know if Wells Fargo insurance passes any of
that commission back to Wells Fargo Bank?

    A.   I -- I don't know one way or the other.
There -- you know, there -- Wells Fargo -- my
understanding is Wells Fargo insurance is a
subsidiary of Wells Fargo and company.  It's not
a -- it's a sister company of Wells Fargo Bank so
passes back to, you know, it -- the parent company
ultimately receives all the revenue from all its
subsidiaries and affiliates, but that's not Wells
Fargo Bank.

    Q.   Okay.  So you don't know one way or the

McKinley Rough.txt

other if Wells Fargo insurance passes part of the
commissions back to Wells Fargo Bank?

       MR. WINSTON:  Okay object to form.

       THE WITNESS:  Yeah, it's my understanding
that they don't, but I -- I don't know how I obtain
that understanding.  It's just that's what I've
understood.

BY MS. CLASBY ENGEL:

    Q.   So you have no personal knowledge, though,
whether or not Wells Fargo Bank receives part of the
commission back from Wells Fargo insurance; correct?

       MR. WINSTON:  Object to form.

       THE WITNESS:  That's correct.

BY MS. CLASBY ENGEL:

    Q.   And you don't know whether soft dollars
are passed back from Wells Fargo insurance to Wells
Fargo Bank; correct?

       MR. WINSTON:  Object to form.

       THE WITNESS:  Yeah, I'm not with soft
costs process.

BY MS. CLASBY ENGEL:

    Q.   Soft dollars?

    A.   Sorry, soft dollars process at the bank.

    Q.   Okay.

       MS. CLASBY ENGEL:  Can we take a five
minute break.

       THE WITNESS:  Sure.

       MS. CLASBY ENGEL:  If that's okay with
everyone.

       THE VIDEOGRAPHER:  This is tend of disk
number one.  The time is 10:12 a.m. and we are now

McKinley Rough.txt

going off record.

        THE VIDEOGRAPHER:  This is the beginning

of disk number two.  The time is 10:20 a.m. and we

are now pack on the record.

BY MS. CLASBY ENGEL:

    Q.   All right.  You mentioned previously that

an 11 percent commission is less than the

incidence --

        AUTOMATED VOICE:  Is now in the

conference.

BY MS. CLASBY ENGEL:

    Q.   Okay.  Let me start over.  You mentioned

previously bra the break that an 11 percent

commission is less than the average industry

standard.  Is that accurate?

    A.   It's less than the average industry

standard for the property insurance policies that

I'm familiar with.

    Q.   Okay.  And do you know what commission

balance bow what paid Bank of America for its lender

placed policies.  No, I do not.

    Q.   And do you know what Assurant paid or pays

chase for a commission relating to the lender placed

policies?

    A.   What Assurant pays Chase?

    Q.   Correct.

    A.   No, no.

    Q.   Or any other -- do you know whether

Assurant pays never other entity as a commission for

LPI policies other than Wells Fargo insurance?

Page 43

McKinley Rough.txt

A.   No, I don't.

Q.   Okay.  Can you name any other lender placed commission that you're aware of and the rate thereof?

A.   No, I can't.  As I mentioned, my statement would apply to property insurance in general.

Q.   Okay.  But not lender placed insurance in specific?

A.   That's right.

Q.   We were talking a little bit before the break about how a policy is placed on a property. And you mentioned that Wells Fargo Bank notified the borrower of the potential lapse, is that your understanding?

A.   My understanding is they arrange to have borrowers notified, I think Assurant is the one that does the notifying.

Q.   Right.  So Ass- -- it's not Wells Fargo Bank that's actually writing the letters, it's actually Assurant, the insurance company; correct?

          MR. WINSTON:  Object to form.

          THE WITNESS:  I haven't reviewed the

letters.  I don't know whose letterhead they're sent on, my understanding is that Assurant sends out the letters that have been approved by -- by Wells Fargo insurance.

BY MS. CLASBY ENGEL:

Q.   And Assurant is paid to send out those letters; correct?

          MR. WINSTON:  Object to form.

          THE WITNESS:  I don't know how they're

Page 44

McKinley Rough.txt

compensated for that activity.

BY MS. CLASBY ENGEL:

    Q.  Okay.  And your understanding or your opinion, what are the responsible -- responsibilities of Wells Fargo Bank as a loan servicer.

    A.  I'm not -- I'm not an expert in -- in bank loan servicing.  I only have the most general understanding of -- of what bank does to service a loan.

    Q.  Okay.  So you wouldn't know if monitoring its portfolio of loans to see whether or not they have insurance is Wells Fargo Bank's responsibility or not?

    A.  It's -- it's my understanding that they have responsibilities to their investors and their

investors expect to have insurance in place on the properties that Wells Fargo services the mortgage for.  So to that extent, if my understanding is correct, that's an activity that the bank is responsible for, yes.

    Q.  Okay.  And in this case, do you know if Wells Fargo insurance is actually the company that's monitoring the portfolio of loans for coverage?

          MR. WINSTON:  Object to form.

          THE WITNESS:  I guess -- do you -- are you referring -- when you say monitoring, are you talking about the tracking system, then.

BY MS. CLASBY ENGEL:

    Q.  Yes.

    A.  Or are you talking about some other

McKinley Rough.txt

methodology?

    Q.   Well, let's talk about the tracking system
action do you know if it's -- who is actually
implementing the tracking system for monitoring
where the portfolio has insurance coverage?

        MR. WINSTON:  Object to form.

        THE WITNESS:  Yeah, it's -- it's my
understanding that that's a -- that Wells Fargo Bank
contracts with Assurant to provide that service.
BY MS. CLASBY ENGEL:

    Q.   Okay.  But and it's your understanding
that's Wells Fargo's bank's responsibility to do
that, is correct?

    A.   Yes.

    Q.   Okay.  And isn't it true that the loans
would have to be monitored for insurance whether or
not anybody ever actually let their policy lapse or
not.

        MR. WINSTON:  Object to form.

        THE WITNESS:  I -- I suppose I can image I
object ways that they don't have to do that, but I
think proper, you know, I think it's prudent of them
to do so.
BY MS. CLASBY ENGEL:

    Q.   Okay.  So it's not a lapse that triggers
the monitoring, the monitoring exists regardless of
whether there as a lapse; correct?

        MR. WINSTON:  Object to form.

        THE WITNESS:  Well, if you don't monitor,
I don't know how you would ever discover that there
was a lapse, so I -- you know, it's a chicken and

McKinley Rough.txt

egg kind of thing, isn't it?

BY MS. CLASBY ENGEL:

    Q.   Going to page 9 of your report you state
that Mr. Berenbaum fails to account for the fact

that the Department of Insurance and virtually all
states have received -- excuse me, have reviewed and
approve rates used by Assurant in its LPI policies,
is that your testimony?

        MR. WINSTON:  Object to form.

        THE WITNESS:  Yes, it is.

BY MS. CLASBY ENGEL:

    Q.   And did you review any of the rate filings
of Assurant in any of these states?

    A.   No, I have not.

    Q.   And do you know specifically what any of
those department of insurance -- in the various
states have done to verify those commissions or --
that -- wait, let me start over.  Have you done
anything to verify or investigate or figure out what
the various insurance commissioners have done to
verify that the rates and commissions are
appropriate.

        MR. WINSTON:  Object to form.

        THE WITNESS:  No, that was outside the
scope of my assignment.

BY MS. CLASBY ENGEL:

    Q.   And is it ever possible that a rate or a
commission could be approved but it really wouldn't
be a fair rate or commission?

        MR. WINSTON:  Object to form.

        THE WITNESS:  I -- I don't know.

Page 47

McKinley Rough.txt

BY MS. CLASBY ENGEL:

 Q. Do you think the insurance regulators are
always right?

 A. I think very few of us are always right,
so I guess I include that me and you and the rest of
the people in this room, so I don't know why
regulators would be any exception.

 Q. Okay.  So it's possible that an insurance
rate or commission could be approved, yet that rate
or commission could still be unfair or
inappropriate; correct?

   MR. WINSTON:  Object to form.

   THE WITNESS:  In theory, I think that's
true.  I'm not an expert in insurance rates and
regular rations, buy really pint that it's the
commission rate that's not approved by one
commissioner but by 49 other commissioners, or
whatever the number is, they've all approved it, so
if they're making a mistake, I guess they're all
making the same mistake.

BY MS. CLASBY ENGEL:

 Q. Right.  But you haven't actually looked at
those file rates and those approvals, have you?

 A. No, I have not.

 Q. So are you relying on Wells Fargo
insurance to tell you that?

 A. To tell me what, I'm sorry?

 Q. That the rates have been approved in all
508 states?

 A. No, it's my understanding that insurance
companies need to file their rate for this type of

McKinley Rough.txt

insurance in the various states and I'm relying on
my experience that they would have had to do so in
order to write insurance in those states.

        Q.   So you don't know that in Florida you can
have lender placed insurance without having a filed
rate.

        Q.   I believe that you could, but it wouldn't
be an admitted policy with approved rates.  You
could have a non-admitted policy where the rates do
not need a regulatory approval.

        Q.   And are you aware that the New York State
department of financial services on July 3rd,
2012, issued a memo that found that the loss ratios
insuredders have actually experienced for forced
place insurance have regularly been far below the
expected loss Irish I don't see insurance insurers
filed with the department and that the department's

investigation suggests that insurers rates for
forced placed insurance may be excessive and
destructive of competition?

                MR. WINSTON:  Object to form.

                THE WITNESS:  I haven't reviewed that
document, no.
BY MS. CLASBY ENGEL:

        Q.   Okay.  And are you aware that the New York
Department of Financial Services is asking all the
insurers who are writing forced place policy to
submit with justification amended rates for forced
place insurance based on factors including
commission and brokerage?

                MR. WINSTON:  Object to form.
                Page 49

McKinley Rough.txt

THE WITNESS:  I -- I have the understanding they were asked to refile the rates, but I don't know the details.  I don't know the details about that.

BY MS. CLASBY ENGEL:

Q.   Okay.  On page 9 of your report, you reference a term "kickback.  And you understand that Mr. Berenbaum is complaining about the kickbacks; correct?

A.   Yes.

Q.   And what is your understanding of a kickback?

A.   I believe a kickback would be a either unapproved or illegal passing of money from one party to the other that's out of the contractual relationship or the custom and practice in an industry.

Q.   And is it your contention that an insurance commission could never be a kickback?

A.   I've never seen an insurance commission that's been paid and I've been in the industry for over 35 years that I would characterize as a kickback.  Is it possible?  I don't -- you'd have to give me a scenario and ask me if I've ever seen it, but I can't remember any where I saw a commission that was paid that I would have termed a kickback. Or that in my opinion anybody in the industry would have termed as a kickback.

Q.   Okay.  Well, can you -- let me present a hypothetical to you what if the LPI premium was a thousand dollars, while -- and Wells Fargo Bank

McKinley Rough.txt

charges its borrower a thousand dollars and the
borrower paid that thousand dollars premium, Wells
Fargo then paid Assurant the thousand dollars,
Assurant gave Wells Fargo insurance a commission of
a hundred dollars and then Wells Fargo insurance

paid that hundred dollars back to Wells Fargo Bank.
Would -- would that be a kickback?

        MR. WINSTON:  Object to form.

        THE WITNESS:  No, it wouldn't be -- oh,
sorry you're asking me if Wells Fargo insurance paid
the commission it received from Assurant to Wells
Fargo Bank, is that --
BY MS. CLASBY ENGEL:

    Q.   A portion of it?

    A.   I don't think no, I don't think that would
be a kickback.  I think that it's in some states
a -- a payment of a part of a commission to an
insured can be considered a rebate and rebates in
some states are illegal.

    Q.   Do you know which states rebates are
illegal?

    A.   No.

    Q.   Do you know why they're illegal?

    A.   I can't say that I know the history of why
rebate laws exist.  I've -- no, I don't.

    Q.   Okay.  So in that hypothetical that I gave
you, assuming Wells Fargo insurance takes a hundred
dollars of its commission and gives it to Wells
Fargo bank, that would not be a kickback?

        MR. WINSTON:  Object to form.  Improper

Page 51

McKinley Rough.txt

hypothetical.

            THE WITNESS:  Yeah, that's -- my
understanding that's not happening here in this
case.  I think that it -- you know, my opinion, no,
I don't think that's a kickback.  I -- it's not a
commission, you know, if -- if they were doing that
I don't see how that's a kickback.

BY MS. CLASBY ENGEL:

    Q.   Okay.  So Wells Fargo insurance could take
its entire commission that it receives from Assurant
and give it to Wells Fargo Bank and that would not
be a kickback?

            MR. WINSTON:  Object to form, improper
hypothetical.

            THE WITNESS:  I -- you know, I -- I don't
think it would be.

BY MS. CLASBY ENGEL:

    Q.   Okay.  On page 9 and 10 of your report at
number 3, you state that all of the activities
performed by Wells Fargo insurance that
Mr. Berenbaum contends are Wells Fargo bank
activities are in fact activities that derive from
the borrower's failure to maintain insurance that
borrowers are contractually obligated to maintain on
their indebted property.

            Is that your testimony?

    A.   Yes.

    Q.   So in your opinion the borrower is
responsible for all consequences after a lapse of
insurance?

    A.   All consequences.

                      Page 52

McKinley Rough.txt

MR. WINSTON:  Object to form.

THE WITNESS:  My understanding is
borrowers are responsible to maintain insurance on
their property, that they've signed an agreement
that they would do so and the agreement says if they
failed to do so, that the bank has the authority to
place that insurance on their behalf and that the
borrower would pay the premium for that insurance.

BY MS. CLASBY ENGEL:

Q.   And is there any limit on what that
premium could be?

A.   The premiums that would be charged would
be derived from the appropriate rates that are --
have been filed and approved by the regulators in
each of the states.  So there is a limit on what
that premium could be.

Q.   Is there a limit on what the commission
could be?

A.   In this program for Wells Fargo Bank, yes,

the commission is specified as 11 percent.

Q.   And you at page 10 of your report, you
state that independent agent like Wells Fargo
insurance typically represents multiple insurance
companies.  And is it your testimony that Wells
Fargo insurance is an independent agent?

A.   In -- in -- they are considered such in
the industry, yes.

Q.   What other insurance companies does Wells
Fargo insurance work with as to lender placed
insurance?

A.   As respects lender placed insurance, they

Page 53

McKinley Rough.txt

may still have a relationship with QBE.  I'm not
familiar with the progress on the changeover from
QBE to Assurant for some of the insured properties.

        Q.   So just QBE and Assurant, then?

        A.   That's my understanding.

        Q.   And but Wells Fargo Insurance has not
brought we business to Assurant that is not Wells
Fargo Bank red; correct?

            MR. WINSTON:  Object to form.

            THE WITNESS:  I don't know one way or the
other.

BY MS. CLASBY ENGEL:

        Q.   And do you know if it represents any other

insureds other than Wells Fargo Bank?

        A.   My knowledge is they represent a large
number of insureds, other than Wells Fargo Bank.

        Q.   With respect to lender placed insurance,
do you know if Wells Fargo insurance represents any
other insureds other than Wells Fargo Bank?

        A.   I don't know one way or the other.

        Q.   So you can't name any other insured that
Wells Fargo insurance represents with respect to
lender placed insurance; correct?

            MR. WINSTON:  Object to form.

            THE WITNESS:  Yeah, I don't know of any
names.

BY MS. CLASBY ENGEL:

        Q.   Okay.

        A.   But I -- I don't know whether they do or
not.  I just don't know -- I don't know the answer
to that question.

                        Page 54

McKinley Rough.txt

    Q.   Okay.  And -- and you didn't take any
steps to find out whether they do or don't; correct?

    A.   I did not ask that question, no.

    Q.   Typically how many clients does an
independent agent have?

          MR. WINSTON:  Object to form.

          THE WITNESS:  I don't know that there San

answer to what would be typically, independent
agents can vary in size from a single individual
operating as an independent agent action or it could
be a national insurance brokerage agency,
organization, with thousands of employees that have
thousands of clients there are -- there are.

BY MS. CLASBY ENGEL:

    Q.   How many?

    A.   Sorry, about you there are over a thousand
independent agents in the United States.

    Q.   Is it typical for independent agents to
have multiple clients?

    A.   Yes.

    Q.   And it's your testimony that Wells Fargo
insurance is not a captive insurance agent?

    A.   My understanding is that Wells Fargo
insurance is an affiliate of Wells Fargo Bank.  It's
a subsidiary of Wells Fargo and company.  It acts as
an independent insurance agent representing
thousands of different different clients.

    Q.   But for lender placed insurance, is it
your testimony that Wells Fargo insurance is not a
captive insurance agent?

          MR. WINSTON:  Object to form.

Page 55

```
                              McKinley Rough.txt
                 THE WITNESS:  You're asking me are they a

captive of Wells Fargo Bank, no, they are not.

BY MS. CLASBY ENGEL:

     Q.   Okay.  And if an agent only had one client

where you can -- would you still consider that agent

to be independent?

     A.   Yes, could be.  It's possible.

     Q.   On page 11 of your report you asked the

question why does Wells Fargo Bank go to such length

to avoid properties being placed in the LPI

programment and you talk about how they're the ones

writing the letters, but in reality isn't -- isn't

it Assurant writing the letters?

                 MR. WINSTON:  Object to form.

                 THE WITNESS:  I believe as I said where, I

believe they're sending the letters.  I believe

that's under contractual arrangements with Wells

Fargo Bank.

BY MS. CLASBY ENGEL:

     Q.   And don't you think the insurance company

would want to avoid placing a policy when there was

already insurance on the property.

                 MR. WINSTON:  Object to form.

                 THE WITNESS:  So we're talking about the

context of lender placed insurance.

BY MS. CLASBY ENGEL:

     Q.   Yes?

     A.   Your -- your question is would they want

to avoid placing insurance when voluntary insurance

is already in place?

     Q.   Yes.
                              Page 56
```

McKinley Rough.txt

    A.   Yes, they would want to do that.  I think that's.

    Q.   Okay.  And do you know?

    A.   Sorry, I think that's what they're doing, that's why they -- my understanding is that's why they send these letters.  They receive information that tells them the insurance wasn't renewed or got canceled or lapsed and they're trying to determine whether or not insurance is in fact in place.

    Q.   Right.  And do you know if Wells Fargo bank offers to pay the borrowers preexisting policy or to reinstate it?

    A.   Do they offer to pay the premium for a preexisting policy.

    Q.   Right, or -- or make efforts to reinstate it?

        MR. WINSTON:  Object to form.

        THE WITNESS:  I'm not -- I'm not aware of those kinds of activities.  I don't know one way or the other if they do that.

BY MS. CLASBY ENGEL:

    Q.   And wouldn't that minimize lender placed insurance if they did that.

        MR. WINSTON:  Object to form.

        THE WITNESS:  If -- you're asking me if Wells Fargo Bank agreed to pay the premium for the voluntary insurance would that be a way to minimize the need for lender placed insurance, is that your question?

BY MS. CLASBY ENGEL:

    Q.   Yes.

Page 57

McKinley Rough.txt

A.   Yes.  This would be one way.  If --

Q.   Okay.  And did you learn that Assurant
sends the letters instead of Wells Fargo Bank after
you wrote your report?

MR. WINSTON:  Object to form.

THE WITNESS:  No, I don't think so.  I
think I knew that I consider my report to be saying
that it's Wells Fargo Bank that causes these letters
to be sent.  Technical typically, if it's Assurant
that's sending the letters, it's my understanding
that these letters are being sent on behalf of Wells
Fargo Bank.

BY MS. CLASBY ENGEL:

Q.   Okay.  And at page 11 of your report, you

reference Exhibit A.  And who drafted Exhibit A?

A.   Mr. Franski.

Q.   And did you do anything to verify that
these tests are actual performed by Wells Fargo
insurance other than talking to Mr. Franski?

MR. WINSTON:  Object to form, asked and
answered.

THE WITNESS:  No.  I did discuss this
Exhibit with Mr. Franski, but I didn't do any
independent research to determine if these
activities were actually conducted.

BY MS. CLASBY ENGEL:

Q.   Okay.  And on page 11 at the bottom it's
your contention -- it's your position, though, that
the Wells Fargo insurance has no duty to provide
service to borrowers?

A.   I don't believe they have a duty to do so,

Page 58

McKinley Rough.txt

that's right.

    Q.   Okay.  And on page 12, you state that the
agent who was responsible for the original placement
of a policy is entitled to commissions the first
year and every year thereafter that the policy
continues in force.  If in fact Wells Fargo
insurance was not the agent responsible for the
original placement of the policy, would they still

be entitled to the commission or not.

       MR. WINSTON:  Object to form, asked and
answered.

       THE WITNESS:  Yeah, the -- the agent who
is considered the broker of record which is a term
of art in insurance that says you're the agent
representing that particular insured, if you're the
broker of record at the time a policy is renewed,
you are the agent or broker who receives the
commission regardless of whether or not you were the
agent or broker at the time the policy incepted.
And I'm I'll just expand a little bit on that
statement because if you are -- if a policy renews
and you're no longer the agent of record then no
you're not entitled to the commission.
BY MS. CLASBY ENGEL:

    Q.   Okay.  Let me just ask you another
question about the premiums and the commissions.  If
Wells Fargo Bank was -- paid $900 for an insurance
premium, would it be fair and appropriate for Wells
Fargo Bank to charge its borrowers $1,200 for that
premium?

       MR. WINSTON:  Object to form, improper

Page 59

McKinley Rough.txt

hypothetical.

       THE WITNESS:  I'm sorry, but you're asking

me on a particular borrower's property?

BY MS. CLASBY ENGEL:

    Q.   Right.

    A.   The rate that Assurant has charged results

in a premium of -- in your example, $900, is --

    Q.   Yes?

    A.   And your question is, would it be

appropriate for Wells Fargo insurance or Wells Fargo

bank to charge their borrower more than that, is

that your question.

    A.   Right, that -- yes.

    Q.   Yes.

    A.   Yes, no, that would not be appropriate.

    Q.   Okay.

       MS. CLASBY ENGEL:  Can we just take a five

minute break and I don't think I'll have too much

longer.

       THE VIDEOGRAPHER:  Off the record,

10:47 p.m.

       (Recess.)

       THE VIDEOGRAPHER:  And we are back on the

record at 10:53 a.m.

       MR. WINSTON:  We're on the record.

       MS. CLASBY ENGEL:  Oh, thank you.

       MR. WINSTON:  Yeah.

BY MS. CLASBY ENGEL:

    Q.   Okay.  We talked about some of your prior

expert reports earlier and I just wanted to know,

Page 60

McKinley Rough.txt
have any -- has your testimony ever been excluded
from a court proceeding for any reason.

        A.    No.

        Q.    Okay.  And are you an actuary?

        A.    I am not.

            MS. CLASBY ENGEL:  Okay.  Thank you,
Mr. McKinley, for coming today, I don't have any
other questions.

            THE WITNESS:  And I just have one
clarification to make, if I may.  Earlier just
before our broke, you were asking me a question
about whether it's ever appropriate for Wells Fargo
Bank to mark up a premium that they were charged on
a mortgage property.  Your example was, I think,
$900 and if it was ever appropriate for them, being
Wells Fargo Bank to charge more than that.

            Did I understand that to be your question,
was that right?

        Q.    Well, I did ask the question, I think the
record will reflect what I asked and what you
responded.

        A.    Okay.  I just want to be sure that the

record now reflects that it's my understanding that
it would be -- that they don't do that, and it would
be up appropriate to do so as respects premium.
There may be other charges that Wells Fargo Bank
makes as a result of there being the need to make a
forced placement of insurance, but it would not be
appropriate for them to mark up a premium charge by
Assurant.

        Q.    So your testimony is that if Wells Fargo

                    Page 61

McKinley Rough.txt

Bank paid $900 for the premium, it would be

inappropriate to charge its borrower $1,200;

correct?

    A.   For the premium, that's right.

    Q.   For the premium?

    A.   Yes.

    Q.   Okay.  So your testimony is still that if

Wells Fargo Bank paid $900 for the premium, it would

be inappropriate for it to charge its borrower

$1,200 for the premium; correct?

    A.   That's my testimony.  I thought that's

what I said before, I just want to be sure that's

what the record reflects.

    Q.   Okay.  Thank you very much.

    A.   Okay.

       MR. WINSTON:  I just have one or two very

minor follow-up questions.

                  EXAMINATION

BY MR. WINSTON:

    Q.   Mr. McKinley, in your experience is the

price that's paid for insurance the only factor that

is considered by -- by a broker in selecting a

carrier or coverage?

    A.   No, it's not, I -- you know, I think

agents and brokers that are acting in their client's

best interest first determine does an insurance

company have the financial strength to underwrite

the risks they're being asked to underwrite, because

if an insurance company isn't going to be around to

pay claims, it doesn't matter how much you paid for

the insurance.  Secondly, an insurance broker will

Page 62

McKinley Rough.txt

consider the coverage being provided, ask the
coverage meet the needs of the insured, if the
coverage isn't appropriate, then you don't have a
claim covered and again it doesn't matter what you
paid for an insurance.  In some instances whether an
insurance company can provide certain services to an
insured is also considered.  How they pay inner.

       Their claims and whether they have a good
claims paying reputation is considered.

       And then, yes, price is also considered

once a broker has satisfied him or herself that that
the carrier being considered meets all the other
qualifications.

    Q.   Now, attached to your report as Exhibit A
is a document that was prepared by Mr. Franski, is
that correct?

    A.   Yes.

    Q.   And what is your understanding of what
that Exhibit A lists?

    A.   My understanding is that is a partial list
of of the value added services that Wells Fargo
insurance has provided to Wells Fargo Bank over the
years that Mr. Frank ski has been in the insurance
program.

    Q.   Now, is the -- obligation, did excuse he
in, is the provision of services tied to Assurant's
obligation to pay a commission to Wells Fargo
insurance?

    A.   No, it's not.  Assurant pays the
commission per its regulatory responsibilities
because of filed rates and because of its

McKinley Rough.txt

contractual relationship with wells with Wells Fargo

insurance.

     Q.   So what is your understanding as to why

Wells Fargo insurance is providing all the services

shown on Exhibit A?

     A.   I think they like other agents and brokers

consider it important to maintain a relationship

with a client and with the insurance company and

they perform activities to enhance that

relationship.  And that's what this describes.  Your

ability to provide those services is sometimes

expected by insureds, but not always.  And it's

usually done just just as a value added service to

the client.

          MR. WINSTON:  I don't have anything

further.

          MS. CLASBY ENGEL:  Okay.  I think that's

it.

          THE VIDEOGRAPHER:  This concludes today's

deposition.

          MS. CLASBY ENGEL:  Thank you very.

          MR. WINSTON:  You're welcome with it.

          THE VIDEOGRAPHER:  The time is now

10:59 a.m. and we are going off the record.