UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:11-cv-81373-DMM

MARK KUNZELMANN, on behalf of
himself and all others similarly situated,

     Plaintiff,

v.

WELLS FARGO BANK, N.A. and
WELLS FARGO INSURANCE, INC., *et al.*,
     Defendants.

_____/

## ORDER DENYING PLAINTIFF MARK KUNZELMANN'S
## MOTION TO CERTIFY CLASS

This action is before me on a motion for class certification, filed on behalf of Plaintiff Mark Kunzelmann ("Plaintiff") and all others similarly situated. Having considered the motions, the Defendants' opposition and Plaintiff's reply, and with the benefit of oral argument, I reach the following findings and conclusions.

### I. Introduction

This case involves lender-placed hazard insurance ("LPI"). This type of insurance comes into play when, for whatever reason, a borrower's insurance lapses. Under such circumstances, the lender acquires insurance, the cost of which is charged to the borrower. It is described by Plaintiff as force-placed insurance while Defendants prefer lender-placed or collateral protection insurance. This case more specifically involves a component of the premium which is paid by the insurance carrier to Wells Fargo Insurance ("WFI"), an affiliate of Wells Fargo Bank, N.A. ("WFB") (collectively, "Wells Fargo"). While Defendants refer to the payment as a "commission," Plaintiff calls it a

1

"kickback." Plaintiff sues for recovery of these payments alleging unjust enrichment and, under Florida law, breach of an implied covenant of good faith and fair dealing.

## II. Background

Plaintiff is a Florida resident whose mortgage loan is serviced by Defendant WFB. (DE 37 at ¶¶ 7, 51). Pursuant to his mortgage contract (the "Mortgage") Plaintiff was required to maintain continuous hazard insurance coverage on the mortgaged property. (DE 62-4 at § 5). The Mortgage contained a force-placed insurance provision which is materially the same as the one included in mortgages for all WFB borrowers nationwide. (DE 62 at 10; DE 70 at 2).

The provision explicitly warned Plaintiff that he was required to maintain hazard insurance on the mortgaged property, and that if he failed to do so, WFB could exercise its contractual right to purchase LPI on the property to protect the collateral securing the loan. Specifically, the provision informed Plaintiff, in pertinent part, that the cost of LPI could "significantly exceed" the cost of insurance that he could obtain on his own, and that "Wells Fargo Insurance would receive a commission on" the insurance policy obtained.[1] (DE 62 at 12; DE 62-13 at 3, 9, 17, 19, 20, 26). Plaintiff failed to maintain the required hazard insurance, and WFB accordingly purchased a LPI policy for the mortgaged property with the assistance of its affiliate, Defendant Wells Fargo Insurance, Inc., from American Security Insurance Company ("ASIC"). (DE 62 at 11-12; DE 70 at 7-8; DE 37 at ¶ 47). The LPI insured the mortgaged property only from the time that Plaintiff's own policy lapsed, and provided coverage despite the absence of any underwriting. *Id.* The annual premium for such coverage was $18,522.04. (DE 62 at 12).

---

[1] Plaintiff testified that he thought that the term "significantly exceed" indicated that his insurance would be 30-40% higher than a voluntary policy. (DE 70 at 19).

2

WFB does not purchase or write insurance for an individual borrower, but instead purchases a group Master Policy from Assurant? ASIC that provides continuous coverage for all loans held by WFB and automatically provides insurance coverage in the event any borrower fails to provide requisite evidence of required insurance. (DE 62-7 at 53:17-22; DE 116-12) (Master Service Agreement). Once a lapse occurs, the policy automatically covers the property from the date of lapse to the date that a replacement policy commences. *Id.* Premiums on LPI policies issued by ASIC are charged directly to WFB. (DE 70-2 at 32). WFB pays the premium, and then passes that cost—without altering or adding to it—to the respective borrower who allowed his own policy to lapse. (DE 70-10 at ¶¶ 2-7; DE 70-8 at 186-187; DE 70-6 at 22; DE 70-1 at 32, 98). At times, the premium amount is added to the monthly loan payment and recovered over a number of months or years, while at other times, the premium is not collected until the end of the loan term or at payoff, all depending on the type of loan and the specific structure of the account. (DE 70-5 at 123; DE 70-11 at ¶ 4(a)).

Only a portion of LPI premiums actually get paid by borrowers. Of the borrowers subject to LPI, at any given time approximately 20% have homes in active foreclosure, 16% are in post-foreclosure status, and 40% are 60 days or more delinquent on their loans. (DE 70-2 at ¶ 4(b); *see also* DE 70-1 at 161-62; DE 70 at 6). Many of these borrowers subsequently enter into some sort of short sale, foreclosure, loan modification, bankruptcy, refinance, payoff, settlement agreement, government-sponsored program, or other agreement whereby the parties compromise their claims against one another and/or finally determine the total amounts due and owing on the account. (DE 70-11 at ¶ 4(d)). The number of borrowers in each of these categories changes almost daily, and

3

determining which borrowers fall into which category requires, at least in part, a file-by-file manual review. *Id.* at ¶ 4.

ASIC pays commissions to WFI (as insurance broker for the LPI program). (*See* DEs 70-12, 70-13). The borrower is not involved in that transaction. Wells Fargo does not establish the LPI rates. That is instead a function of the LPI insurer, in conjunction with state regulators. (DE 70-6 at 58-60). ASIC is an "admitted carrier" in 49 of the 50 states in the country (including in Florida), meaning that its rates and all expense components of those rates—including the business acquisition/broker commission component—are filed with and approved or authorized by the insurance regulation offices in each of those 49 states. Each office of insurance regulation has a different process for reviewing and approving rates, and each regulator engages in various levels of dialogue with ASIC about the information contained in its rate filings. (*See, e.g.,* DE 28 at 5-7; *see also* DE 70-10 at ¶¶ 2-7). Wells Fargo has also terminated its practice of receiving commissions, but the premiums ultimately charged to consumers remain unchanged. (DE 83 at 2). The commissions are included as a component of the insurance rates that are filed with state insurance regulators in each state. (Transcript of Oral Argument at 15-16, *Kunzelmann v. Wells Fargo Bank, N.A.,* No. 11-cv-81373-DMM (S.D. Fla. Dec. 17, 2012)) [hereinafter "Transcript"].

Plaintiff alleges that he should be reimbursed for the broker commission paid by ASIC to WFI because that commission is purportedly excessive, inflated, and unearned. Plaintiff seeks to represent a nationwide class (the "Nationwide Class") claiming unjust enrichment, and a Florida subclass (the "Florida Subclass") claiming breach of the implied covenant of good faith and fair dealing. The Nationwide Class includes borrowers with properties throughout the United States, and the Florida Subclass includes borrowers with properties in Florida, both of whom:

were charged premiums for force-placed insurance policies issued by <u>Assurant</u> or any of its affiliates within the applicable statute of limitations through December 20, 2011 ("the Class Period"), unless (1) the lender has obtained a foreclosure judgment against the borrower; (2) the borrower has entered into a short-sale agreement with the lender; (3) the borrower has granted a deed in lieu of foreclosure to the lender; (4) the borrower has entered into a loan modification agreement with the lender; (5) the borrower has filed a claim for damages which has been paid in full or in part by [ASIC]; or (6) the charge to the borrower for force-placed insurance was cancelled in full.[2]

(DE 62 at 3-4).

### III. Class Certification Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01, 99 S. Ct. 2545 (1979)). "A party seeking class certification must affirmatively demonstrate compliance with [Federal Rule of Civil Procedure 23][,]" (*id.* at 2551), and "[a] district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.*, 564 F. 3d 1256, 1266 (11th Cir. 2009) (citations and internal quotation marks omitted). "Although the trial court should not determine the merits of plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F. 3d 1181, 1188 n.15 (11th Cir. 2003). Thus, a district court may "probe behind the pleadings before coming to rest on the certification question[,]"[3] as "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 131 S. Ct. at 2551; *accord Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n.12 (1978) ("The class determination generally involves considerations that are 'enmeshed in the factual and legal issues

---

[2] Aside from customary exclusions for affiliates, the Nationwide Class also excludes borrowers who had LPI on properties located within New York.

[3] *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372 (1982).

comprising the plaintiff's cause of action.' . . . '[T]he more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.'") (internal citations omitted).

"For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in [Rule 23(a)], as well as at least one of the requirements set forth in Rule 23(b)." *Vega*, 564 F. 3d at 1265. Under Rule 23(a), a putative class may only be certified if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

Here, the parties do not contest numerosity and it is therefore not necessary to analyze that requirement. "Under the Rule 23(a)(2) commonality requirement, a class action must involve issues that are susceptible to class-wide proof." *Murray v. Auslander*, 244 F. 3d 807, 811 (11th Cir. 2001). The Rule 23(a)(3) typicality requirement is similar to the commonality requirement but distinguishable because, "[a]lthough typicality and commonality may be related," the two concepts have been distinguished in that "[t]raditionally commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Vega*, 564 F. 3d 1275 (quoting *Piazza v. Ebsco Indus., Inc.*, 273 F. 3d 1341, 1146 (11th Cir. 2001)). Further, Rule 23(a)(4) mandates that the named plaintiff must prove that (1) no conflict of interest exists between him and the putative class members and that (2) the action will be vigorously prosecuted. *See Sonsa v. Iowa*, 419 U.S. 393, 403, 95 S. Ct. 553, 559 (1975).

Once the threshold issue of Rule 23(a) has been resolved, courts must then determine whether the proposed certification of a class satisfies the requirements of Rule 23(b). In this case, the Plaintiff only seeks certification under Rule 23(b)(3). The party seeking certification of a class under that provision must demonstrate that common questions predominate over individual interests and that a class action is the superior means of adjudicating such a controversy. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Klay v. Humana Inc.*, 382 F. 3d 1241, 1255 (11th Cir. 2004). Superiority is determined where the moving party can demonstrate "increased efficiency" through the class mechanism. *Jackson v. Motel 6 Multipurpose Inc.*, 130 F. 3d 999, 1006 (11th Cir. 1997). In determining whether the requirements of Rule 23(b)(3) have been satisfied, courts also look to:

> (1) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (2) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (4) the likely difficulties in managing a class action.

*Vega*, 564 F. 3d at 1277 (quoting FED. R. CIV. P. 23(b)). "The burden of proof to establish the propriety of class certification rests with the advocate of the class." *Valley Drug Co.*, 350 F. 3d at 1187. With these requirements in mind, I turn to the question of certification.

## IV.  Discussion

### 1. Rule 23(a)
### a. Rule 23(a)(2): Commonality

There may be some common issues of fact and law presented here. The mortgage contract with borrowers is substantially the same for all members of the proposed class. The Master Insurance Policy between Assurant and WFB and the relationship between WFI and WFB is the same as are the bank's policies for placement of lender-placed insurance. Plaintiff alleges that the 11% commission is the same for all class members and also that the issue of whether the commission is "earned" does not differ among the class. (Transcript at 78).

Nevertheless, as discussed in greater detail in the "predominance" section of this Order, liability in this case hinges on the uncommon and individualized determination of notice, knowledge, and motivation of each class member.  The lack of commonality with respect to the core elements of the Plaintiff's claims with foundational importance to any finding of liability precludes a finding of commonality. *See Vega*, 564 F. 3d at 1275.

### b. Rule 23 (a)(3): Typicality

Mr. Kunzelmann paid his premium for his lender-placed insurance.[4] In doing so, he differs from many if not most of the putative class members who are more than 60 days in arrears on their mortgage, in foreclosure, or post-foreclosure proceedings. His knowledge, awareness, and voluntary payment after consulting with legal counsel is atypical of the class and subjects him to defenses not applicable to others.

Defendants point to *Baptista v. J.P. Morgan Chase Bank, N.A.*, 640 F. 3d 1194 (11th Cir. 2011), as one of the obstacles to Mr. Kunzelmann's claim. There the plaintiff attempted to assert

---

[4] Specific facts concerning this payment are set forth *infra* section IV.2(a)(i).

8

a claim on behalf of herself and others for unjust enrichment stemming from a bank's practice of charging a $6.00 fee for cashing a check. The Eleventh Circuit affirmed dismissal of the claim stating:

> Here, Baptista requested to have the check cashed immediately upon presentment to Chase, and in return, Chase requested a $6.00 fee. Baptista agreed to the fee. If Baptista had chosen to deposit the check in her own account and wait for processing, no fee would have been levied. The fee was only levied because Chase conferred an additional benefit on Baptista, that is, immediate payment of the check. Because Baptista cannot show that Chase failed to give consideration for her $6.00, her claim for unjust enrichment fails as a matter of law.

*Id.* at 1198 n.3. Here, Plaintiff argues that because Mr. Kunzelmann was faced with a choice of withholding payment or default, his payment cannot be deemed voluntary. Defendants counter that he implicitly accepted the LPI, including the premiums he paid, after receiving requests to purchase his own insurance but failing to do so. While this is not the time to decide the merits of these arguments, it is apparent that Mr. Kunzelmann's claim faces a hurdle not shared by other class members.

Mr. Kunzelmann's claims may also face another roadblock not shared by others within the proposed class – the "direct payment" requirement of Florida law. Defendants rely on *Virgilio v. Ryland Group*, 680 F. 3d 1329 (11th Cir. 2012). That case involved a class action brought by purchasers of homes against a builder, Ryland Group ("Ryland"), and others (the "Terrabrook defendants") involved in marketing the homes for Ryland. The complaint alleged that the defendants knew and failed to disclose to the plaintiffs that the residential community was in close proximity to a World War II bombing range, which contained unexploded ammunition, and that the plaintiffs were damaged by the decrease of their homes' values when the bombing range's existence became public. The plaintiffs argued that it would be inequitable for the Terrabrook defendants to retain the

commissions paid by Ryland, which were based on the percentage of moneys paid by the plaintiffs to Ryland at closing. The plaintiffs argued that they had conferred a benefit on the Terrabrook defendants because "Ryland was merely a pass-through conduit required to deliver the 1.5 percent fee to defendants." *Virgilio*, 680 F. 3d at 1337. The Eleventh Circuit held that dismissal of the unjust enrichment claim was appropriate because the plaintiffs had not conferred a direct benefit on the defendant. "The mere fact that Ryland bargained away its right to 1.5 percent of the purchase price of Plaintiffs' houses did not change the fact that Ryland, not Plaintiffs, conferred the benefit on Defendants." *Id.* at 1337.

The commission in this case is not paid to WFI by the plaintiffs, but instead the insurance company pays it. Plaintiff argues that the facts in this case are different and that *Ryland* can be distinguished. They also correctly point out that in many states direct benefit is *not* an essential element of an unjust enrichment claim. As his case is controlled by Florida law, however, Mr. Kunzelmann's claim faces a hurdle not shared by those from states that do not impose a direct benefit requirement and his claim is therefore atypical.

Finally, under Florida law, where there is privity of contract, a claim cannot be brought for unjust enrichment. Mr. Kunzelmann's mortgage contract was with Wells Fargo Bank, which means that under Florida Law, he cannot pursue an unjust enrichment claim against the Bank. Yet he is seeking to bring a case on behalf of others – an unjust enrichment case against WFB which he himself cannot bring.  Thus his claim of typicality fails.

### c.  Rule 23(a)(4): Adequacy

There is no doubt that Mr. Kunzelmann is represented by skilled counsel. Yet aspects of the prosecution of his claim cause me to question his adequacy as a class representative. Efforts to

shoehorn his claim in a transparent attempt to surmount obstacles to class certification undermine any determination of adequacy. Since I find that the requirements of commonality and typicality are not met and that the predominance and superiority requirements of Rule 23(b)(3) cannot be demonstrated, I decline to make a finding as to adequacy.

## 2. Rule 23(b)(3)

### a.  Rule 23(b)(3): Predominance

In *Vega v. T-Mobile USA, Inc.*, the Eleventh Circuit noted, "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega*, 564 F. 3d at 1274. While Plaintiff argues that this may be that rare case, it seems to be a textbook example of why such a claim can not be certified. First, a claim for unjust enrichment or a claim based on a breach of the implied covenant of good faith and fair dealing requires examination of the particular circumstances of an individual case as well as the expectations of the parties to determine whether an inequity would result or whether their reasonable expectations were met. *Id.*; *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097-98 (Fla. 1st DCA 1999). Second, Plaintiff seeks a national class on the unjust enrichment claim, but the substantial variations in law among the fifty states "swamp any common issues and defeat predominance." *See Klay v. Humana, Inc.*, 382 F. 3d 1241, 1261 (11th Cir. 2004).  Indeed, as I indicated previously, one of the variations of state law – the requirement of a direct benefit conferred by a plaintiff on the defendant – strongly weighs against  a finding that Plaintiff's claim is typical of the class. Similarly, Plaintiff's offer to apply the most restrictive law of any state and thereby trim the claims of other plaintiffs not only highlights the variations in state law, but also undermines his claim of adequacy. Finally, the close regulation of this form of insurance by the states, the application of the filed-rate doctrine, and the

necessity to examine the rate-making determinations of various states in determining the reasonableness of the commission structure at issue would render the class unmanageable.

### i. The Individual Nature of the Claims

In Florida, "[t]he essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that would make it inequitable for him to retain it without paying the value thereof." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006); *see Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004); *see also Vega*, 564 F. 3d at 1274-75 (11th Cir. 2009).

In *Vega*, Judge Tjoflat explained that before granting relief on the equitable claim of unjust enrichment, a court must examine the particular circumstances of an individual case in order to assure itself that without a remedy inequity would persist or result. *Id.* at 1275. In the context of lender-placed insurance, several examples suffice to show the necessity for such scrutiny.

The named Plaintiff's own case illustrates this point. Mr. Kunzelmann's 2005 mortgage from Wachovia Bank, which was subsequently acquired by Wells Fargo Bank, required him to maintain his own insurance coverage, and indicated that "the cost of [lender-placed] insurance coverage . . . might *significantly exceed* the cost of insurance that Borrower could have obtained [on his own]." (DE 62-4 at § 5) (emphasis added) ("Lender is under no obligation to purchase any particular type or amount of coverage").

According to his deposition, Mr. Kunzelmann believed that lender-placed insurance could be 30-40% more expensive than non-LPI coverage. (DE 70-14 at 5-6). Subsequently, from October 2005 through 2009, Mr. Kunzelmann received monthly statements, and each warned him that he

must maintain hazard insurance, that an LPI policy would typically be "2 to 4 times" the cost of a non-LPI policy, and that an affiliated insurance broker would obtain a commission from an LPI insurer if the lender was required to insure the property. (DE 70-14 at 72).

In May 2009, Mr. Kunzelmann received a letter indicating that unless he provided proof of adequate wind insurance, Wachovia would purchase a LPI policy, that an affiliate of the bank would receive a commission, and that the annual premium would be approximately $18,210. He sent proof of insurance and no LPI coverage was placed.

In May 2010, he failed to renew his hazard insurance policy. In January 2011, he refinanced his mortgage to obtain a better interest rate. The 2011 mortgage also contained a provision requiring the borrower to maintain hazard insurance, allowing WFB to place insurance in the event of a lapse, and again indicating that lender-placed insurance could "significantly exceed" the cost of non-LPI coverage.

In March 2011, Mr. Kunzelmann received a letter from WFB, similarly to the 2009 letter indicating that he had failed to provide proof of insurance. DE 70-15 at 51-52. He failed to respond. In June 2011, he received another letter, which also offered to assist him in obtaining insurance through "multiple insurance companies[,]" but Kunzelmann again failed to act. ( *See* DE 70-15 at 53-55).

In July 2011, WFB sent another letter informing Mr. Kunzelmann that it had acquired temporary coverage and if he did not provide proof of insurance, the temporary binder would be converted to a full one-year policy. Specifically, the letter warned:

> The cost of the insurance [that Wells Fargo] secure[s] may be much higher than the amount you would normally pay, . . . it will be obtained with the assistance of Wells Fargo Insurance Inc., a licensed insurance agency, and affiliate of Wells Fargo Bank

> N.A., [and that] Wells Fargo Insurance acts as an agent for the insurance company and will receive a commission on the [lender placed insurance].

(DE 70-15 at 58).  The yearly premium for the temporary binder was $ 18,522.04, compared to the

$13,368.00 voluntary premium that Plaintiff's prior insurance carrier would have charged him.

Mr. Kunzelmann obtained his own policy from his insurance agent, effective August 25,

2011. WFB then cancelled the LPI policy from August 25, 2011 through January 2012, and refunded

that portion of the premium to his escrow account. Mr. Kunzelmann was charged, however, with a

pro-rated LPI premium through August 24, 2012. The premium charged was the same as that filed

by the insurance company with and approved by the Florida Office of Insurance Regulation.  (DE

28 at 5-7; *see also* DE 70-10 at ¶¶ 2-7).

On November 28, 2011, in order to refinance his loan with another lender and while talking

with lawyers about filing a lawsuit against Wells Fargo, Mr. Kunzelmann made a substantial

payment against his WFB escrow account paying the LPI premium. On December 20, 2011, Mr.

Kunzelmann paid the entirety of his WFB loan and filed this action.  (DE 70-15 at 27-29, 181-83,

200-201).

These facts are, in many respects, similar to those considered by the Eleventh Circuit in *Vega*.

There, employees who earned commissions for selling pre-paid plans for T-Mobile were subject to

a charge back of those commissions if the customer deactivated the service within 180 days of

activation. *Vega*, 564 F. 3d at 1261. Subsequently the company instituted a rule that considered a

pre-paid account deactivated if a consumer did not use the account for 90 consecutive days. The

plaintiff in *Vega* filed a putative class action alleging that since T-Mobile was paid in advance for

the prepaid service it bore no risk of loss and that T-Mobile had unjustly profited from its unilateral change in its compensation policies.

The Eleventh Circuit pointed out that while the *Vega* plaintiff alleged that he was unaware that his commissions for pre-paid plans were subject to charge back, some of his colleagues were well versed in T-Mobile's procedures. Accordingly, said the court, "whether or not a given commission charge was 'unjust' will depend upon what each employee was told and understood about the commission structure and when and how the commissions were 'earned.'" *Vega*, 564 F. 3d at 1275. "Those employees who concede awareness that commissions advanced . . . during the charge back window are not 'earned,' but are instead subject to charge back, cannot claim injustice when the company follows its compensation policies as expected and understood." *Id.* The court concluded that "[t]he uncommon and individualized nature of the actual inquiries, and its foundational importance to the liability determination for each class member, renders class certification inappropriate." *Id.*

With substantial notice, and a high degree of awareness of the relative cost of LPI, Mr. Kunzelmann, while apparently considering a lawsuit, chose to pay his pro-rata premium. Other borrowers undoubtedly knew much less; moreover, only a portion of borrowers ever actually pay the premium. (DE 70-1 at 161-62; DE 70 at 6). The individual circumstances of each borrower are central to any determinations of injustice.

Contrast Mr. Kunzelmann's particular circumstances with another scenario not uncommon during the housing crisis. Many borrowers, underwater on their mortgage and owing far more than their home is worth, choose to walk away from their property.[4] These borrowers stop making

---

[4]*See* Mary Ellen Podmolik, *Sinking Values Prompting Homeowners to Consider Strategic Default as Best Business Decision*, CHI.TRIB. (May 22, 2011);  Neil Bhutta, Jane Dokko & Hui Shan, *The Depth of*

mortgage payments, allow their insurance to lapse, and quit maintaining their property, but nevertheless continue to live in the house with no intention to pay, while awaiting eviction. While such a borrower would be within the proposed class, I question whether that borrower has conferred a direct benefit on the defendant by being charged a premium that he or she never intends to pay. At oral argument, Plaintiff's counsel argued that it was never just to be charged a premium and, even if a borrower had no intention to ever pay, the borrower's account should be credited. (Transcript at 18-19). But shouldn't the trier of fact consider these individual circumstances before being asked to grant relief?

Other circumstances are readily envisioned: the homeowner who cannot obtain wind or hazard insurance and gladly accepts lender-placed insurance; the borrower who finds that the lender-placed insurance is cheaper than insurance that a particular borrower can obtain on his own; and the borrower who committed mortgage fraud in order to obtain a loan. In short, because of the fact-specific nature of the inquiry required, an unjust enrichment claim is almost always – and certainly here – not suitable for class action treatment.

Similarly, while the Eleventh Circuit has not addressed class certification of a claim for violations of Florida's implied covenant of good faith and fair dealing, the requirement of a fact intensive inquiry in such cases is well established.[5]

---

*Negative Equity and Mortgage Default Decisions* 1–3 (Fed. Reserve Bd., FEDS Working Paper No. 2010-35, 2010).

[5] "Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo v. UPS Co.*, 420 F. 3d 1146, 1151-52 (11th Cir. 2005). "Parties to a contract raise the implied covenant of good faith and fair dealing when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Trilogy Props. LLC v. SB Hotel Assocs. LLC*, No. 09-21406, 2010 WL 7411912, at *6 (S.D. Fla. Dec. 23, 2010) (citing *Publix Super Markets, Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004)). "Where there are no standards for exercising discretion, the implied covenant of good faith protects contracting parties' reasonable commercial expectations." *Publix*, 876 So. 2d at 655.

In *Anderson Windows Inc. v. Hochberg*, 997 So. 2d 1212 (Fla. 3d DCA 2008), Florida's Third District Court of Appeal reversed an order approving a settlement, finding that the trial court committed error by failing to conduct an analysis of the parties' reasonable commercial expectations. *Id.* at 1214-15. The District Court noted that the implied covenant of good faith and fair dealing "varies with the context in which it arises." *Id.* at 1215 n.2.[6]

Likewise, in *Speedway SuperAmerica, LLC v. Tropic Enterprises*, 966 So. 2d 1 (Fla. 2d DCA 2007), the Second District Court of Appeal reversed the trial court's grant of summary judgment on a claim that a landlord had breached the implied covenant by refusing to provide consent for the assignment of a lease at issue. Whether the landlord acted capriciously, in contravention of the parties' contractual expectations, could only be determined through an analysis of all attendant circumstances concerning his refusal of consent. *Id.*; *see Tiara Condo. Ass'n v. Marsh & McLennan Cos., Inc.*, 607 F. 3d 742, 747 (11th Cir. 2010) (quoting *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000)) ("Under Florida law, a party breaches this implied covenant by 'a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party.'"); *see also Publix*, 876 So. 2d at 655 ("Unless no reasonable party in the position of [Publix] would have

---

However, "the implied obligation of good faith cannot be used to vary the express terms of a contract." *Cox*, 732 So. 2d at 1098 (citing *City of Riviera Beach v. John's Towing*, 691 So. 2d 519, 521 (Fla. 4th DCA 1997)). Nor is the implied covenant available where the terms of a contract at issue are unambiguous. *Avatar Dev. Corp. v. De Pani Const., Inc.*, 834 So. 2d 873, 876 (Fla. 4th DCA 2002).

[6] In *Market Street Associates Limited Partnership v. Frey*, 941 F. 2d 588 (7th Cir. 1991), Justice Posner addressed the ambiguity presented in defining the scope of the implied covenant of good faith and fair dealing. In assessing whether the implied covenant of good faith and fair dealing was applicable to a particular contract, Justice Posner noted that "the concept of the duty of good faith like the concept of fiduciary duty is a stab at approximating the terms the parties would have negotiated had they foreseen the circumstances that have given rise to their dispute." *Id.* at 594. This approach is consistent with Florida law.

made the same discretionary decision [Publix] made, it seems unlikely that its decision would violate the covenant of good faith.") (alteration in original).

Like the claim for unjust enrichment, the need to examine the state of mind of each borrower, including awareness, expectations, and conduct requires individualized scrutiny incompatible with class treatment.

### ii.  Unjust Enrichment Varies From State To State

"To certify a multi-state class action, a plaintiff must prove, through 'extensive analysis' that there are no material variations among the law of the states for which certification is sought." *Klay v. Humana, Inc.*, 382 F. 3d 1241, 1262 (11th Cir. 2004) (citations omitted).  A district court should deny certification if the plaintiff fails to carry this burden.  *Id.*

The law of unjust enrichment varies significantly from state to state. For example, Florida, South Carolina, Idaho, North Carolina, Ohio, and Pennsylvania all require a benefit to pass directly from the defendant to the plaintiff. *See Virgilio*, 680 F. 3d at1337; *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 532 S.E.2d 868, 872 (S.C. 2000); *Beco Const., Inc. v. Bannock Paving Co., Inc.*, 797 P. 2d 863, 866 (Idaho 1990). Other states such as Nevada, Connecticut, Arkansas, Georgia, and New York permit plaintiffs to recover where the benefit was indirectly conferred. *See Town of New Hartford v. Conn. Res. Recovery Auth.*, 970 A.2d 592, 618 (Conn. 2009); *Smith v. Whitener*, 856 S.W.2d 328, 330 (Ark. Ct. App. 1993); *In re Turer's Estate*, 133 N.W.2d 765, 768-69 (Wis. 1965); *Bates-Farley Sav. Bank v. Dismukes*, 33 S.E. 175, 178-79 (Ga. 1899). Some states, like Alaska, have yet to address the direct benefit requirement to pursue an unjust enrichment claim, while others such as Delaware, have just recently established such a requirement. *See Vichi v. Koninklijke Philips Elecs. N.V.*, 2578-VCP, 2012 WL 5949204, at *22 (Del. Ch. Nov. 28, 2012). In addition to the

18

"direct benefit" requirement inherent in some unjust enrichment claims, some states, such as Florida and Alaska, require that there be no available legal remedy at law, *see Bowleg v. Bowe*, 502 So. 2d 71, 72 (Fla. 3d DCA 1987); *Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983), while others, like Connecticut, only require the lack of a legal remedy under a contract. *See United Coastal Indus., Inc. v. Clearheart Constr. Co., Inc.*, 802 A.2d 901, 906 (Conn. App. Ct. 2002).

The degree of wrongful conduct necessary to demonstrate unjust enrichment also varies between states. For example, in Alabama the recipient of the benefit must have "engaged in some unconscionable conduct such as fraud, coercion or abuse of a confidential relationship." *Welch v. Montgomery Eye Physicians, P.C.*, 891 So. 2d 837, 843 (Ala. 2004). Moreover, "[b]ecause unjust enrichment claims are fact specific to each case," the Alabama Supreme Court "has repeatedly held that such claims are unsuitable for class-action treatment." *Avis Rent A Car Systems, Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2004). In other states, like Arkansas and New Jersey, "[i]t is not necessary to show that the party unjustly enriched committed any wrongdoing . . . ." *Day v. Case Credit Corp.*, 427 F. 3d 1148, 1154 (8th Cir. 2005) (applying Arkansas law).

Potential defenses, such as unclean hands, would also have to be evaluated on a state-by-state and individual-by-individual basis, and are particularly relevant since each putative class member has failed to maintain his own insurance coverage, necessitating issuance of the LPI policies. For example, some states require fraudulent conduct, while others do not. *Compare Polverari v. Peatt*, 614 A.2d 484 (Conn. App. Ct. 1992) (requiring defendant to demonstrate that plaintiff engaged in "willful misconduct"), *with Dennett v. Kuenzli*, 936 P.2d 219 (Idaho Ct. App. 1997) (allowing a court to deny a plaintiff equitable relief if the plaintiff's "conduct has been inequitable, unfair and dishonest, or fraudulent and deceitful as to the controversy at issue").

Plaintiff's response to the argument that variations in state law defeat certification has presented a moving target. Initially, it was argued that the laws of unjust enrichment were "materially identical" among the fifty states. (DE 62 at 18). Then it was argued that the states could be "separated into three groups." *Id.* at 19. In his Reply, Plaintiff seems to acknowledge the direct-benefit obstacle imposed by some states, but argues that *Ryland* can be distinguished on the merits, in part relying on a truncated quotation from a deposition of a WFI corporate representative. (DE 80 at 3; *see also* DE 83). Then at oral argument Plaintiff's counsel argued that they were prepared to prove the elements of unjust enrichment based on the most restrictive formulation of any of the fifty states. (Transcript at 43).[7] In a supplemental memorandum, Plaintiff argued that 27 states were substantially similar in their law of unjust enrichment and that only six of those states required a plaintiff to show it had conferred a direct benefit.[8] (DE 132-1 at 2, 4). Finally, as a fallback position, Plaintiff suggested a Florida-only unjust enrichment class. *Id.* at 6.

As these machinations show, Plaintiff has failed to carry his burden that there are no material variations in state law. Whether treated as a predominance question or a manageability question, this is fatal to the quest for certification. *See Sikes v. Teleline, Inc.*, 281 F. 3d 1350, 1367 n.44 (11th Cir. 2002), *abrogated on other grounds*, *Bridge v. Pheonix Bond & Indemn. Co.*, 553 U.S. 639, 128 S.Ct. 2131 (2008) ("Assuming that the district court was correct in ruling that the laws of all fifty states apply, that alone would render the class unmanageable."); *Castano v. Am. Tobacco Co.*, 84 F. 3d 734,

---

[7] Specifically, Plaintiff's counsel stated that "we're going to ask for the most extreme instruction, which is that they had actual knowledge of what they were doing. So by asking your Honor to rule on that question, there's no variance because we're saying we'll take the strictest standard of the states which we allege for unjust enrichment." (Transcript of Oral Argument at 32-33).

[8] Plaintiff also claimed that these twenty-seven states require a plaintiff to demonstrate that the defendant knew of or appreciated the benefit received. (DE 62 at n.9).

741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance.").

i.      iii  **Application of the Filed-Rate Doctrine Requires State-by-State Analysis**

The filed-rate doctrine recognizes that where a legislature has established a scheme for rate-making, the rights of the rate-payer in regard to the rate he paid are defined by that scheme. *Taffet v. Southern Co.*, 967 F. 2d 1483, 1491-92 (11th Cir. 1992).[9]  In response to Defendants' argument that variations among the states in application of the filed-rate doctrine would require a state-by-state analysis, Plaintiff contends that I have already "disposed of" the filed-rate defense. This is simply not so. In denying the Motion to Dismiss, I relied on Plaintiff's argument that he was not challenging the actual insurance rates, but rather "bundled administrative costs and unearned kickbacks." Plaintiff also argued that discovery had not determined whether the "kickbacks" and administrative costs that Wells Fargo imposed were covered by the filed-rates or were "added on to amounts derived from the rates." (DE 41 at 7). Indeed, Plaintiff objected to a document attached as an exhibit to Defendants' Motion arguing that since it was outside the four corners of the complaint, it should not be considered at the motion to dismiss stage. Plaintiff also contended that "this document addresses only one aspect in the inflated premium . . . and *only in the State of Florida*." (DE 41 at 7 n.4) (emphasis added).

My consideration now, of course, is not as limited. Moreover, during oral argument on the Motion to Certify, Plaintiff's counsel seemed to concede that the "unearned" commission, about

---

[9]The origin of the filed-rate doctrine can be traced back to *Texas & Pacific R. Co. v. Abilene Cotton Oil Co*, 204 U.S. 426 (1907), where the Supreme Court addressed the issue of whether a shipper could maintain an action for damages against a common carrier for an alleged unreasonable rate where the rate had been filed with the Interstate Commerce Commission (the "I.C.C."). The court held that the shipper's only redress was through the I.C.C., which had the power to alter established rates. *Id.* at 438-39.

which he complained, is part of the rate filed by the insurance carrier in each state. (*See* DE 38-6 at

1; Transcript at 15). It seems apparent that the filed-rate doctrine is an issue that must be addressed.

To determine whether, and to what extent the filed-rate doctrine is applicable would require

an analysis of each state's formulation of the doctrine and may require examination of the regulatory

proceedings involved in approving the rate filed.[10] For example, Alabama and Florida law require

that that a plaintiff exhaust administrative remedies before being able to challenge the rate filed with

and approved by regulators, *see Zimmerman v. Fla. Windstorm Underwriting Ass'n*, 873 So. 2d 411,

413 (Fla. 1st DCA 2004); *Tindle v. State Farm General Ins. Co.*, 826 So. 2d 144 (Ala. Civ. App.

2001), while Minnesota and Wisconsin law prohibit any challenges to rates filed with the applicable

authority. *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 317 (Minn. 2006); *Prentice*

*v. Title Ins. Co. of Minn.*, 500 N.W. 2d 658, 663 (Wis. 1993). In Texas, the filed-rate doctrine only

provides for a rebuttable presumption of reasonableness. *See Mid-Century Ins. Co. of Tex. v.*

*Ademaj*, 243 S.W. 3d. 618 (Tex. 2007) (citing to *Sw. Elec. Power Co. v. Grant*, 73 S.W. 3d 211,

216-17 (Tex. 2002)). In Arizona, courts have thus far declined to recognize the filed-rate doctrine.

*See Qwest Corp. v. Kelly*, 59 P. 3d 789, 800-01 ("We need not determine, however, whether Arizona

should adopt [the filed-rate] doctrine and apply it when a state regulatory agency is involved."). In

New York, claims for "'unjust enrichment' where a consumer has paid the filed-rate[,]" are not

permitted. *Porr v. Nynex Corp.*, 660 N.Y.S.2d 440, 448 (N.Y. App. Div. 1997).[11]   In short,

---

[10] Plaintiff's expert, Birny Brinbaum, agreed that whether the LPI rates filed with state regulators are approved would "depend upon the state." (DE 70-8 at 57). Plaintiff's counsel also conceded that the premiums charged to consumers and filed with different states will vary from state to state. (Transcript at 10).

[11] Some states like Kentucky and Oklahoma acknowledge exceptions to the filed-rate doctrine in instances of fraud. *See, e.g., Satellite Sys., Inc. v. Birch Telecom of Okla., Inc.*, 51 P. 3d 585 (Okla. 2002); *Com. ex rel. Chandler v. Anthem Ins. Companies, Inc.*, 8 S.W. 3d 48, 54-55 (Ky. Ct. App. 1999). Others, including New York, do not. *See, e.g., Porr*, 660 N.Y.S.2d at 445.

differences between the states in their application of the filed-rate doctrine render certification of a nationwide class improper.[12]

### b. Rule 23(b)(3): Superiority

As discussion of the filed-rate doctrine demonstrates, any substantial relief from "excessive or unearned" premiums for lender-placed insurance must likely be sought from state insurance regulators. Plaintiff's expert Birney Birnbaum was recently quoted in a New York Times article on *"The High Price of Forced Insurance"* as saying: "The responsibility comes down to regulators to do their job and say rates need to be reasonable and not excessive."[13]

However, Section 1463 of the Dodd-Frank Act imposes a number of servicing-related requirements under the Real Estate Settlement Procedures Act of 1974 ("RESPA") relating to lender-placed insurance and error resolution responses to requests for information. Among these provisions, Section 6(m) of RESPA requires that charges related to lender-placed insurance, other than charges subject to State insurance regulation, must be bona fide and reasonable. Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified as amended in scattered sections of U.S.C. (2006 & Supp.

---

[12] Some states have also adopted specific statutes regulating lender-placed insurance. For instance, Connecticut and Hawaii, prohibit receipt of a commission in relation to placement of a lender-placed insurance policy. CONN. GEN. STAT. § 38a-816(11)(a)(iii); HAW. REV. STAT. § 431:13-104(b)(3). On the other hand, in New Jersey a borrower is statutorily precluded from bringing such a claim challenging the rate of lender-placed insurance so long as the creditor accurately files the rate of premium with that state's department of insurance. *See* N.J. STAT. ANN. § 17:16V-1(g).

[13]    Lisa Prevost, *The High Price of 'Forced' Insurance*, N.Y. TIMES, Oct. 4, 2012. *See also* Zachary Tracer & David Beasley, *U.S. Regulators to Examine Forced-Place Insurance*, BLOOMBERG BUSINESSWEEK, Aug. 10, 2012 ("Top regulators in Florida, Kentucky and Louisiana announce intent to evaluate rates associated with lender-placed insurance), available at http://www.businessweek.com/news/2012-08-10/u-dot-s-dot-regulators-to-examine-forced-place-insurance. In California, Insurance Commissioner Dave Jones announced that American Security Insurance Company would have to reduce its rates by 30.5% which will result in $42.7 million in savings. Press Release, California Department of Insurance, *Insurance Commissioner Dave Jones Announces $42.7 Million Rate Reduction for Policyholders of "Force-Placed" Mortgage Insurer* (Oct. 22, 2012), *available at* http://www.insurance.ca.gov/0400-news/0100-press-releases /2012/release49-12.cfm.

IV 2011)) [hereinafter "Dodd-Frank Act"]. Congress also amended Section 6f of RESPA (12 U.S.C. § 2605f) to increase penalties for the private right of action available to enforce the Act's requirements. An individual borrower can recover actual damages resulting from violation of the Act as well as additional damages "in case of a pattern or practice of non-compliance" with the Act's requirements. *Id.* In the case of a class action, in addition to actual damages, a class member can recover up to $2,000 as damages in addition to actual damages if a pattern or practice of non-compliance is demonstrated, with total damages to the class not to exceed $1,000,000 or one percent of the net worth of the mortgage servicer. Attorney's fees and costs are also authorized. If, as Plaintiff's counsel alleged in opposing Defendants' Motion to Dismiss based on the filed-rate doctrine, Defendants are charging borrower's excessive and unearned fees apart from rates filed with insurance regulators, a statutorily-authorized private right of action is superior to this deeply flawed action. In any event, since claims for unjust enrichment and breach of an implied covenant require case-by-case scrutiny, I cannot find a class action superior to litigation conducted by and on behalf of an individual named party.[14]

---

[14]   Whether some other cause of action might be amenable to class treatment is unknown. I note that Plaintiff's counsel has filed another action in this district against several defendants including the Wells Fargo Defendants alleging ten (10) separate claims: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) violation of the Florida Deceptive and Unfair Trade Practices Act; (5) violation of the Truth in Lending Act; (6) tortious interference with a business relationship; (7) breach of fiduciary duty; (8) violation of the New York General Business Law, Section 349; (9) violation of the anti-tying provisions of the Bank Holding Company Act; and (10) violation of the Racketeer Influenced and Corrupt Organizations Act. *Hall v. Bank of America, N.A.,* filed July 24, 2002 (S.D. Fla., No.12-cv-22700). To paraphrase President Ronald Reagan, there must be a pony in there somewhere. With attorney's fees and treble liquidated damages provisions often available, state consumer protection statutes are viable individual actions and would allow the offsetting of borrower liabilities and thus avoid the bifurcated procedures Plaintiff concedes would be necessary here.

## V. <u>Conclusion</u>

For the reasons set forth above, it is hereby

**ORDERED and ADJUDGED** that the Motion to Certify Class (DE 62) is **DENIED.**

**DONE and ORDERED** in Chambers, in West Palm Beach, Florida, this 10th day of

January, 2013.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record.

25